**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 313-1887
Facsimile: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN CHUL YANG, derivatively on behalf of HUMANIGEN, INC., | |
| Plaintiff, | Case No.: |
| v. | |
| CAMERON DURRANT, TIMOTHY MORRIS, RAINER BOEHM, RONALD BARLIANT, CHERYL BUXTON, DALE CHAPPELL, KEVIN XIE, and JOHN HOHNEKER, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| HUMANIGEN, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**INTRODUCTION**

Plaintiff In Chul Yang ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Humanigen, Inc. ("Humanigen," or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Cameron Durrant ("Durrant"), Timothy Morris ("Morris"), Rainer Boehm ("Boehm"), Ronald Barliant ("Barliant"), Cheryl Buxton ("Buxton"), Dale Chappell ("Chappell"), Kevin Xie ("Xie"), and John Hohneker ("Hohneker") (collectively, the "Individual Defendants" and with the Company, "Defendants") for breaches of their fiduciary duties as directors and/or officers of the Company, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; against Defendants Durrant, Boehm, Barliant, Buxton, Chappell, Xie, and Hohneker for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); and against Defendants Durrant and Morris for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings,

wire and press releases published by and regarding the Company, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the directors and officers of the Company from May 28, 2021 to July 12, 2022, both dates inclusive (the "Relevant Period").

2.      Humanigen is a clinical-stage biopharmaceutical company headquartered in Short Hills, New Jersey. The Company was founded in 2000 in California and reincorporated in Delaware in September 2001 as KaloBios Pharmaceuticals, Inc. In August 2017, the Company changed its name to Humanigen, Inc.

3.      Humanigen's business currently consists of developing an immunomodulatory antibody drug candidate called lenzilumab ("LENZ"), intended to treat COVID-19 patients experiencing cytokine release syndrome ("CRS" or "cytokine storms"). CRS occurs when the immune system produces a sudden large discharge of inflammatory causing signaling molecules called cytokines. CRS is an acute systemic inflammatory syndrome marked by fever and multiple organ

dysfunction, and sometimes, total organ failure.

4.    In severe COVID-19 cases, high levels of granulocyte macrophage-colony stimulating factor ("GM-CSF") and inflammatory myeloid cells correlate with CRS, and consequently, respiratory failure.

5.    Throughout the Relevant Period, the Company represented that LENZ produced "positive results" in multiple trials and studies, that LENZ improved the likelihood of survival without ventilation ("SWOV") in recently hospitalized COVID-19 patients, and that LENZ was the only GM-CSF drug candidate undergoing a Phase 3 trial.

6.    One of the studies was sponsored directly by Humanigen and sought to assess whether the use of LENZ, alongside current standards of care, could alleviate CRS and improve SWOV in hospitalized COVID-19 patients (the "LIVE-AIR Study"). The LIVE-AIR Study launched on May 5, 2020, and was a randomized, double-blind, multicenter, placebo-controlled phase 3 trial.

7.    The National Institute of Health, through the National Institute of Allergy and Infectious Diseases ("NIAID"), sponsored another study, titled, the Accelerating Covid-19 Therapeutic Interventions and Vaccines study (the "ACTIV-5/BET-B Study"). In the ACTIV-5/BET-B Study, researchers evaluated the performance of LENZ and remdesivir together versus a placebo and remdesivir together in hospitalized COVID-19 patients. The ACTIV-5/BET-B Study sought to

3

achieve "statistical significance on the primary endpoint," which was defined as the "proportion of patients with baseline CRP<150mg/L and age<85 years, alive and without mechanical ventilation" through twenty-nine days.

8.    In May 2021, Humanigen applied to the United States Food and Drug Administration ("FDA") seeking Emergency Use Authorization ("EUA") for LENZ for hospitalized COVID-19 patients (the "LENZ EUA").

9.    The truth began to emerge on September 9, 2021, when Humanigen announced, through a press release, that the FDA rejected the LENZ EUA. The press release revealed that the FDA stated it "was unable to conclude that the known and potential benefits of lenzilumab outweigh the known and potential risks of its use as a treatment for COVID-19."

10.    On this news, the price per share of the Company's common stock fell $7.14 per share, or approximately 47.25%, from closing at $15.11 per share on September 8, 2021, to close at $7.97 per share on September 9, 2021.

11.    The truth continued to emerge on December 28, 2021, when Kiniksa Pharmaceuticals, Ltd., announced that its developmental drug, mavrilimumab, produced lackluster results in its Phase 3 trial. Mavrilimumab aimed to treat acute respiratory syndrome caused by COVID-19. Both Kiniksa's Mavrilimumab and Humanigen's LENZ were GM-CSF therapeutics intended to treat the same diseases. Despite this, the Company told investors throughout the Relevant Period that LENZ

was the only drug candidate in development intended to treat these ailments.

12.    The truth fully emerged on July 13, 2022, when Humanigen announced that LENZ lacked statistical significance on the primary endpoint of NIAID's ACTIV-5/BET-B Study.

13.    On this news, the price per share of the Company's common stock fell $2.38 per share, or approximately 79.6%, from closing at $2.99 per share on July 12, 2022, to close at $0.61 per share on July 13, 2022.

14.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements and omissions about the true efficacy and safety of LENZ and concealed the true commercial viability of LENZ. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make to the investing public certain false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's statements about LENZ's efficacy in treating hospitalized COVID-19 patients were false and unreliable; (2) consequently, it was not likely that the FDA would approve the LENZ EUA; (3) likewise, it was not likely that the ACTIV/BET-B Study would reach its primary endpoint; (4) as a result, LENZ's commercial and clinical viability were grossly exaggerated; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public

statements were materially false and misleading at all relevant times.

15.    The Individual Defendants' misrepresentations had the effect of misleading the investing public and artificially inflating the Company's stock during the Relevant Period.

16.    In further breach of their fiduciary duties to the Company, the Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact.

17.    At all relevant times, the Individual Defendants further breached their fiduciary duties by causing the Company to fail to maintain effective disclosure controls and procedures and adequate internal controls.

18.    In light of the Individual Defendants' misconduct—which has subjected the Company, its CEO, its Chairman of the Board and its former Chief Financial Officer ("CFO") and Chief Operating Officer ("COO") to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the District of New Jersey (the "Securities Class Action") which has further subjected the Company to the need to undertake intake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of

dollars.

19.     In light of the breaches of fiduciary duty by the Individual Defendants, seven of whom constitute the entirety of the Company's current Board, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants Durrant Morris, and Chappell's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, the Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on the Company's behalf with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

21.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.    Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

24.    Plaintiff is a current shareholder of the Company. Plaintiff has continuously held Company common stock at all relevant times.

### Nominal Defendant Humanigen

25.    Humanigen is a Delaware corporation with its principal executive offices at 830 Morris Turnpike, 4th Floor, Short Hills, New Jersey, 07078. Since September 22, 2020, the Company's common stock trades on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "HGEN." Prior to September 22, 2020, the Company's common stock traded on the OTCQB Venture Market ("OTCQB") under the symbol "HGEND."

### Defendant Durrant

26.    Defendant Durrant is and has been the CEO and Chairman of the Board since March 2016 and January 2016, respectively. He also served as Humanigen's interim CFO from July 1, 2019 to July 31, 2020. According to the Company's proxy

statement filed on Schedule 14A with the SEC on April 12, 2022 (the "2022 Proxy Statement"), as of April 5, 2022, Defendant Durrant beneficially owned 2,190,648 shares of the Company's common stock, or 3.0% of the Company's total outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 5, 2022 was $10.19, Defendant Durrant owned approximately $22.3 million worth of Company stock at that time.

27.    For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Durrant received $9,717,751 in total compensation from the Company. This included $640,000 in salary, $8,874,712 in option awards, and $203,039 in non-equity incentive plan compensation.

28.    The 2022 Proxy Statement stated the following about Defendant Durrant:

> *Cameron Durrant, M.D., MBA*, has served as our Chairman of our Board since January 2016, and as our Chief Executive Officer since March 2016. In addition, Dr. Durrant served as our Interim Chief Financial Officer from July 1, 2019 to July 31, 2020. From May 2014 to January 2016, Dr. Durrant served as Founder and Director of Taran Pharma Limited, a private semi-virtual specialty pharma company developing and registering treatments in Europe for orphan conditions. Dr. Durrant served as President and Chief Executive Officer of ECR Pharmaceuticals Co., Inc., a subsidiary of Hi-Tech Pharmacal Co., Inc., from September 2012 to April 2014 until its acquisition by Akorn. He previously has been a senior executive at Johnson and Johnson, Pharmacia Corporation, GSK and Merck. Dr. Durrant was a director of Immune Pharmaceuticals Inc. from July 2014 to September 2018 and serves on the boards of directors of two privately held healthcare companies. Dr. Durrant earned his medical degree from the Welsh National School of Medicine, Cardiff, UK, his DRCOG from the Royal

9

College of Obstetricians and Gynecologists, London, UK, his MRCGP from the Royal College of General Practitioners, London, UK, and his MBA from Henley Management College, Oxford, UK. Dr. Durrant brings to the Board extensive experience as a pharma/biotech entrepreneur, operating executive and board member, as well as his day-to-day operating experience as our Chief Executive Officer.

**Defendant Morris**

29.    Defendant Morris served as the COO and CFO of the Company from August 2020 until October 2022, when he resigned. He previously served on the Company's Board until his resignation in August 2020. According to the 2022 Proxy Statement, as of April 5, 2022, Defendant Morris beneficially owned 260,731 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2022 was $10.19, Defendant Morris owned approximately $2.7 million worth of Company stock at that time.

30.    For the 2021 Fiscal Year, Defendant Morris received $777,270 in total compensation from the Company. This included $475,000 in salary, $152,487 in option awards, $143,983 in non-equity incentive plan compensation, and $5,800 in all other compensation

31.    An August 3, 2020 current report filed on Form 8-K with the SEC stated the following about Defendant Morris:

Mr. Morris, age 58, served as the Chief Financial Officer of Iovance Biotherapeutics, Inc., a publicly traded immuno-oncology biotech company (Nasdaq: IOVA), from August 2017 to June 2020. From March 2014 to June 2017, Mr. Morris served as Chief Financial Officer and Head of Business Development of AcelRx Pharmaceuticals, Inc., a

10

specialty pharmaceutical company. From November 2004 to December 2013, Mr. Morris served as Senior Vice President Finance and Global Corporate Development, Chief Financial Officer of VIVUS, Inc. a biopharmaceutical company. Mr. Morris received his BS in Business with an emphasis in Accounting from California State University, Chico, and is a Certified Public Accountant (Inactive). Mr. Morris has extensive operational experience with public companies in the biopharmaceutical industry, particularly in the areas of finance and corporate development.

**Defendant Boehm**

32.     Defendant Boehm has served as a Company director since February 2018. He is also the Chair of the Nominating and Corporate Governance Committee and a member of the Audit Committee. According to the 2022 Proxy Statement, as of April 5, 2022, Defendant Boehm beneficially owned 185,553 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2022 was $10.19, Defendant Boehm owned approximately $1.9 million worth of Company stock at that time.

33.     For the 2021 Fiscal Year, Defendant Boehm received $67,041 in total compensation from the Company. This included $52,500 in cash and $14,541 in stock options.

34.     The 2022 Proxy Statement stated the following about Defendant Boehm:

> *Rainer Boehm, M.D., MBA*, has served as a member of our Board since February 2018. Mr. Boehm has been a biopharmaceutical industry leader for more than three decades. At Novartis for 29 years, he held roles of increasing responsibility culminating with his position

11

as Chief Commercial and Medical Affairs Officer and as ad interim CEO of Novartis' pharmaceuticals division. His background spans senior leadership, marketing, sales and medical affairs positions in both oncology and pharmaceuticals and he has led regions around the world, including North America, Asia and all emerging markets. Mr. Boehm has overseen the launch and commercialization of many new drugs in his career, including blockbuster breakthroughs Cosentyx and Entresto, and major oncology brands including Afinitor, Exjade, Tasigna, Femara, Zometa and Glivec. Mr. Boehm also currently serves on the board of directors for the following companies: Cellectis SA, a clinical-stage biopharmaceutical company focused on immunotherapies based on gene-edited CAR-T cells; Nordic Nanovector ASA, a clinical-stage biopharmaceutical company focused on targeted radiotherapies; BioCopy AG, a preclinical-stage company focused on copying of biomolecules; Berlin Cures AG, a clinical-stage biopharmaceutical company focused on the development of therapies against auto-antibodies. He graduated from the medical school at the University of Ulm in Germany and received his MBA from Schiller University at the Strasbourg campus in France. Mr. Boehm brings to the Board significant knowledge and experience within the biopharmaceutical industry, as well as financial acumen and operational experience.

**Defendant Barliant**

35.    Defendant Barliant has served as a Company director since January 2016. He is also a member of the Nominating and Corporate Governance Committee. According to the 2022 Proxy Statement, as of April 5, 2022, Defendant Barliant beneficially owned 308,745 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2022 was $10.19, Defendant Barliant owned approximately $3.1 million worth of Company stock at that time.

36.    For the 2021 Fiscal Year, Defendant Barliant received $59,831 in total compensation from the Company. This included $48,000 in cash and $11,831 in stock options.

37.    The 2022 Proxy Statement stated the following about Defendant Barliant:

> ***Ronald Barliant, JD***, has served as a member of our Board since January 2016. Mr. Barliant has been Of Counsel to Goldberg Kohn, Ltd. since January 2016, and immediately prior to that had served as a principal in Goldberg Kohn's Bankruptcy & Creditors' Rights Group since September 2002. He previously served as U.S. bankruptcy judge for the Northern District of Illinois from 1988 to 2002. Mr. Barliant has represented debtors and creditors in complex bankruptcy cases, and counseled major financial institutions, business firms and boards of directors in connection with workouts. Mr. Barliant brings to the Board valuable experience gained from a distinguished legal career as a counselor to numerous boards, considered judgment and financial sophistication.

### Defendant Buxton

38.    Defendant Buxton has served as a Company director since December 2019. She is also the Chair of the Compensation Committee and is a member of the Audit Committee. According to the 2022 Proxy Statement, as of April 5, 2022, Defendant Buxton beneficially owned 117,268 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2022 was $10.19, Defendant Buxton owned approximately $1.2 million worth of Company stock at that time.

13

39.     For the 2021 Fiscal Year, Defendant Buxton received $65,196 in total compensation from the Company. This included $49,500 in cash and $15,696 in stock options.

40.     The 2022 Proxy Statement stated the following about Defendant Buxton:

> ***Cheryl Buxton, MSc.***, has served as a member of our Board since December 2019. Until her retirement in December 2020, Ms. Buxton worked for over 25 years at Korn/Ferry International, the world's largest executive search company. Most recently, she served as the Korn Ferry Vice Chairman, Global Sector Leader, Pharmaceuticals, based in the Princeton office. Ms. Buxton conducted senior level assignments, with a special focus on research driven organizations. She also led the R&D sector for the Pharmaceutical and Consumer divisions within Korn Ferry. Ms. Buxton joined Korn Ferry's London office and European headquarters before spending time in Paris and then relocating to Princeton in 1997. Prior to joining Korn Ferry, Ms. Buxton was human resources director for Johnson & Johnson Pharmaceuticals (Cala Ltd), based in the U.K., where her focus was on organizational issues and strategic resourcing and guidance on European directives. She also provided human resources support to three smaller companies in the group for Europe. Her human resources career started at Bristol Myers Ltd., where she was responsible for its consumer and pharmaceutical business. Ms. Buxton holds a master's degree in employment law and industrial relations from Leicester University, a degree in Nursing, a diploma in personnel management and is a member of the Institute of Personnel and Development. and the Advisory Board for South Asia Pharmaceutical Council. She previously was on the board of directors of SIFE. Ms. Buxton brings to the Board significant knowledge and experience within the biopharmaceutical industry, as well as leadership experience and an extensive executive network.

**Defendant Chappell**

41.    Defendant Chappell has served as a Company director since February 2021 and as the Company's CSO since July 2020. According to the 2022 Proxy Statement, as of April 5, 2022, Defendant Chappell beneficially owned 12,649,814 shares of the Company's common stock, or 18 percent of the total outstanding stock of the Company at that time. Given that the price per share of the Company's common stock at the close of trading on April 5, 2022 was $10.19, Defendant Chappell owned approximately $128.9 million worth of Company stock at that time.

42.    For the 2020 Fiscal Year, Defendant Chappell received $1,284,526 in total compensation. This included $200,341 in salary, $1,016,576 in option awards, and $67,609 in non-equity incentive plan compensation.

43.    The 2022 Proxy Statement stated the following about Defendant Chappell:

> ***Dale Chappell, M.D., MBA***, has served as a member of our Board since February 2021. In addition, Dr. Chappell was appointed as our Chief Scientific Officer on July 6, 2020. Dr. Chappell is the managing member of Black Horse Capital Management LLC ("BH Management"), a private investment manager that specializes in biopharmaceuticals, a position he has held since 2002, and is the beneficial owner of a significant number of shares of our common stock. Since April 2015, Dr. Chappell has served as CEO, President and CFO of Cheval US Holdings, Inc., a private investment company with holdings in the hospitality industry. Previously, Dr. Chappell was an associate with Chilton Investment Company, covering healthcare, and an analyst at W.P. Carey & Company. Dr. Chappell, who received his MD from Dartmouth Medical School and his MBA from Harvard Business School, began his career as a Howard Hughes Medical

Institute fellow at the National Cancer Institute where he studied tumor immunology, worked as a researcher in the labs of Dr. Steven A. Rosenberg and Dr. Nicholas P. Restifo and is published in the field of GM-CSF. Dr. Chappell previously served as a member of the Board from June 2016 to November 2017. Prior to joining the Company in a full-time role as our Chief Scientific Officer, Dr. Chappell advised and consulted with management as our ex-officio chief scientific officer. Dr. Chappell brings to the Board his extensive experience in the biopharmaceuticals industry, provides our Board with unparalleled insight into the Company's development pipeline in his capacity as Chief Scientific Officer, as well as the perspective of a significant stockholder in the Company.

**Defendant Hohneker**

44.    Defendant Hohneker has served as a Company director since October 2021. He currently serves as a member of the Nominating and Corporate Governance Committee and the Compensation Committee. According to the 2022 Proxy Statement, as of April 5, 2022, Defendant Hohneker beneficially owned 7,110 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2022 was $10.19, Defendant Hohneker owned approximately $72,450 worth of Company stock at that time.

45.    For the 2021 Fiscal Year, Defendant Hohneker received $10,054 in total compensation from the Company. This included $10,054 in stock options.

46.    The 2022 Proxy Statement stated the following about Defendant Hohneker:

***John Hohneker, M.D.***, has served as a member of our Board since October 2021 and has over 30 years of drug development and leadership experience in the biopharmaceutical industry. Dr. Hohneker most recently served as President and CEO of Anokion SA, a Swiss biotechnology company, from January 2018 to January 2021. Prior to Anokion SA, he led Research and Development at Forma Therapeutics, a biotechnology company, from August 2015 to January 2018. Prior to Forma, Dr. Hohneker held various leadership roles during his 14 years at Novartis AG, from 2001 to 2015, where he last served as Senior Vice President and Global Head of Development, Immunology and Dermatology. Prior to Novartis, he held several positions of increasing responsibility over a nearly 11-year period beginning at Burroughs Wellcome and then with its successor Glaxo Wellcome. Dr. Hohneker also currently serves on the board of directors for the following companies: Curis, Inc.(Nasdaq: CRIS), a publicly traded biotechnology company focused on the development and commercialization of innovative therapeutics for the treatment of cancer; BioTheryX, Inc., a private clinical-stage biopharmaceutical company focused on restoring protein homeostasis; Aravive, Inc. (Nasdaq: ARAV), a publicly traded biotechnology company focused on cancer treatments; Evelo Biosciences (Nasdaq: EVLO), a publicly traded clinical-stage biotechnology company developing orally delivered product candidates; Inzen Therapeutics, a private research stage biotechnology company, and Trishula Therapeutics, a private clinical-stage biotechnology company targeting cancer immunotherapy. He also served as a director of Dimension Therapeutics, Inc., which was a publicly traded biotechnology company, from January 2017 until it was acquired by Ultragenyx Pharmaceutical Inc. in October 2017. Dr. Hohneker received a bachelor's degree in chemistry from Gettysburg College and a medical degree from the University of Medicine and Dentistry of New Jersey at Rutgers Medical School. He completed his internship and residency in internal medicine and his fellowship in medical oncology, all at the University of North Carolina at Chapel Hill. In addition to his operational experience and expertise in the biopharmaceutical industry, Dr. Hohneker brings to the Board his direct experience leading business development and licensing deals, raising capital, and serving on corporate boards through acquisitions.

**Defendant Xie**

47.     Defendant Xie has served as a Company director since October 2021.

He also serves as the Chair of the Audit Committee and as a member of the

Compensation Committee. According to the 2022 Proxy Statement, as of April 5,

2022, Defendant Xie beneficially owned 8,246 shares of the Company's common

stock. Given that the price per share of the Company's common stock at the close of

trading on April 5, 2022 was $10.19, Defendant Xie owned approximately $84,026

worth of Company stock at that time.

48.     For the 2021 Fiscal Year, Defendant Xie received $13,282 in total

compensation from the Company. This included $13,282 in stock options.

49.     The 2022 Proxy Statement stated the following about Defendant Xie:

*Kevin Xie, Ph.D.*, has served as a member of our Board since October
2021. Dr. Xie has nearly twenty years of experience evaluating and
investing in companies across an array of healthcare-related industries,
first for 13 years on the buy-side and then for six years in industry where
he also demonstrated the ability to add value through operational
improvements. He is currently the Chief Financial Officer of Gracell
Biotechnologies Inc. (Nasdaq: GRCL), a global clinical-stage
biopharmaceutical company dedicated to discovering and developing
breakthrough cell therapies intended to disrupt conventional
approaches to CAR-T cell therapies, a position he has held since July
2020. Prior to Gracell, Dr. Xie was the President of Healthcare
Holdings for Fosun Group from March 2015 to July 2020, where he
focused on investment projects in biotechnology, pharmaceutical,
healthcare information technology, and healthcare services industries.
Dr. Xie co-founded and served as Portfolio Manager of Locust Walk
Capital from April 2010 to January 2012. Dr. Xie had previously served
as Healthcare Sector Head at Scopia Capital, and as a Managing
Director at Great Point Partners. He previously served on the Board of

Directors for ViewRay, Inc. (Nasdaq: VRAY), a publicly traded medical device company that develops advanced radiation therapy technology for the treatment of cancer, from October 2019 to March 2022. In addition, from July 2020 to September 2021, Dr. Xie served on the Board of Directors of Alpha Healthcare Acquisition Corp., a publicly traded special purpose acquisition company, leading up to its business combination with Humacyte, Inc. Dr. Xie has a Bachelor of Science in Material Science and Engineering from Tianjin University, an MBA in Finance from The Wharton School of the University of Pennsylvania, and a PhD in Chemistry from The City University of New York. Dr. Xie brings to the Board his extensive experience in raising capital and serving on boards within the biopharmaceutical and biotechnology industries.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

50.    By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the Company's business and corporate affairs, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

51.    Each director and officer owes the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

19

52.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

53.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

54.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of the Board at all relevant times.

55.    As the senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the

Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

56.    To discharge their duties, the Company's officers and directors were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the Company's officers and directors were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to the Company's own Code of Business Conduct (the "Code");

(b)    conduct the affairs of the Company in an efficient, business-like

manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

57.    Each of the Individual Defendants further owed to the Company and the shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

58.    At all times relevant hereto, the Individual Defendants were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

59.    Because of their advisory, executive, managerial, directorial, and controlling positions with the Company, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

60.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public

23

statements issued by the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

61.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

62.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

63.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of

conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of the Company was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

64.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of their overall contribution to and furtherance of the wrongdoing.

65.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

## COMPANY'S CODE OF BUSINESS CONDUCT AND CORPORATE GOVERNANCE

### Humanigen's Code of Business Conduct

66.     The Code, in its second section, titled, "Purpose," states that the Board adopted the Code in order to "deter wrongdoing and to promote":

- Honest and ethical conduct, including the ethical handling of actual or

25

apparent conflicts of interest between personal and professional relationships;

- Full, fair, accurate, timely and understandable disclosure in reports and documents that Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company;

- Compliance with applicable governmental laws, rules and regulations;

- The protection of Company assets, including corporate opportunities and confidential information;

- The prompt internal reporting to an appropriate person or persons identified in the Code of violations of the Code; and

- Accountability for adherence to the Code.

67.    Moreover, the Code states that "[i]t does not cover every issue that may arise, but it sets out basic principles to guide all directors, officers, employees and representatives of Humanigen, Inc. (the "Company"). All Company directors, officers, and employees must conduct themselves accordingly and seek to avoid even the appearance of improper behavior."

68.    With regard to conflicts of interest, the Code states that "[c]onflicts of interest are prohibited as a matter of Company policy[.]"

69.    With regard to "Compliance," the Code provides that "[w]e must all work to ensure prompt and consistent action against violations of the Code."

70.    Regarding "Public Disclosure of Information," the Code states as follows:

The federal securities laws require the Company to disclose certain information in various reports that the Company must file with or submit to the SEC. In addition, from time to time, the Company makes other public communications, such as issuing press releases.

The Company expects all directors, officers, employees and other personnel who are involved in the preparation of reports the Company files with the SEC reports, or other documents that are publicly disseminated, to ensure that the information disclosed in those documents is full, fair, accurate, timely and understandable.

To the extent that you reasonably believe that questionable accounting or auditing conduct or practices have occurred or are occurring, report those concerns to the Chief Executive Officer or Chief Financial Officer or in accordance with the Company's Whistleblower Policy or other procedures for addressing such concerns as may be adopted by the Audit Committee of the Board of Directors.

71.    The Code also provides that "[a]ll reports of known or suspected violations involving the accuracy of the Company's financial reports and related matters should be reported either directly to the Audit Committee[.]"

***Humanigen's Board of Directors Guidelines on Significant Corporate Governance Issues***

72.    Humanigen's Board of Directors Guidelines on Significant Corporate Issues (the "Board Guidelines") under section "Responsibilities of The Board of Directors" outlines the "primary responsibilities" of the Company's Board of Directors:

The primary responsibilities of the Board are oversight, counseling and direction to the management of the Company in the interest and for the benefit of the Company's stockholders. The Board's responsibilities include the matters identified below:

27

(a) Selecting, regularly evaluating the performance of, and approving the compensation of the Chief Executive Officer and other senior executives;

(b) Planning for succession with respect to the position of Chief Executive Officer and monitoring management's succession planning for other senior executive roles;

(c) Reviewing and, where appropriate, approving the Company's major financial objectives, strategic and operating plans and actions;

(d) Overseeing the conduct of the Company's business to evaluate whether the business is being properly managed;

(e) Overseeing the processes for maintaining the integrity of the Company with regards to its financial statements and other public disclosures, and compliance with law and ethics; and

(f) Monitoring the effectiveness of the governance practices under which the Board operates and make changes as needed.

73.    Under "Corporate Business Principles," the Board Guidelines establish requirements for conduct and ethical behavior of the Company's Board members:

Members of the Board must act at all times in accordance with the requirements of the Company's Code of Business Conduct, which is applicable to each director. This obligation at all times includes, without limitation, adherence to the Company's policies with respect to conflicts of interest, confidentiality, protection of the Company's assets, ethical conduct in business dealings and respect for and compliance with applicable law. Any waiver of the requirements of the Code of Business Conduct with respect to any individual director will be reported to, and be subject to the approval of, the Board.

### *Humanigen's Audit Committee Charter*

74.    Humanigen's Audit Committee Charter states that one of the Audit

28

Committee's purposes is to "assist the Board in fulfilling its oversight responsibilities relating to the Company's accounting and financial reporting and disclosure processes and the audit of the Company's financial statements."

75.    The Audit Committee Charter also describes the Audit Committee's specific responsibilities "to serve as an independent and objective monitor" of:

- The quality and integrity of the Company's financial statements, accounting principles, reporting and related disclosures;

- The effectiveness of the Company's disclosure controls and procedures and internal controls over financial reporting;

- The Company's compliance with legal and regulatory requirements and internal policies regarding ethical conduct; and

- The qualifications, independence and performance of the Company's independent registered public accounting firm (the "independent auditors").

76.    The Audit Committee Charter further enumerated certain "responsibilities and authority" of the Audit Committee, including, *inter alia*, the following:

- Reviewing periodically, with the Company's management and independent auditors, the Company's financial reporting processes and disclosure controls and procedures, including the Company's policies and procedures designed to assure that information required to be disclosed in its periodic public reports is accurately reported within the time periods specified by the SEC;

- Reviewing periodically, with the Company's management and independent auditors, the adequacy and effectiveness of the

Company's internal controls over financial reporting designed to protect assets and provide assurance that transactions are properly authorized, executed, recorded and summarized in the Company's books of record. As part of this responsibility, the Committee will meet with management at least annually to review its plan for the maintenance, modification, enhancement and testing of such controls for the ensuing fiscal year;

- Reviewing the reports prepared by management, and (if required by SEC rules) attested to by the Company's independent auditors, assessing the adequacy and effectiveness of the Company's internal controls over financial reporting, prior to the inclusion of such reports in the Company's periodic filings as required under the rules of the SEC. If applicable, the Committee's review will focus on any significant deficiencies in, any significant changes to, or material weaknesses in such controls reported by the independent auditors, or comments and management's responses contained in any accompanying management letter;

*       *       *

- Directing the independent auditors to review, before filing with the SEC, the Company's interim financial statements included in quarterly reports on Form 10-Q, using professional standards and procedures for conducting such reviews;

77.    The Audit Committee Charter further provides that the Audit Committee is tasked with oversight of controls and procedures as follows: "Reviewing, approving and monitoring the Code of Business Conduct for the Company in accordance with the applicable rules of Nasdaq and the SEC, including any waivers of the Code of Business Conduct for any directors and officers."

78.    The Individual Defendants violated the Code, Company policy, and the Company's corporate governance documents by engaging in or permitting the

30

scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and failing to report the same. Further in violation of the Code, the Board Guidelines, and the Company's policies, the Individual Defendants failed to maintain internal controls, failed to maintain the accuracy of Company records and reports, and failed to comply with applicable laws and regulations.

79.    In violation of Humanigen's Audit Committee Charter, Defendants Xie (as Chair), Buxton, and Boehm (the "Audit Committee Defendants") conducted little, if any, oversight of Humanigen's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of Humanigen's Audit Committee Charter, the Audit Committee Defendants failed to adequately oversee major issues regarding the Company's accounting principles and financial statement presentations and major issues related to the adequacy of the Company's internal controls, including the

Company's internal control over financial reporting and disclosure controls and procedures.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

80.     Humanigen is a Delaware corporation based in Short Hills, New Jersey that seeks to research, develop, and manufacture a portfolio of anti-inflammatory and immune-oncology monoclonal antibodies. Humanigen mainly focuses on developing human antibodies for therapeutic use for patients with acute and chronic conditions.

81.     During the Relevant Period and extending into present time, Humanigen's lead drug candidate is LENZ, a monoclonal antibody. The Company purports that LENZ offers advantages over other competitors due to LENZ's high potency, slow-off rate, and lower likelihood of inducing an inappropriate immune response or infusion related reactions. In May 2020, Humanigen began trials centered on treating hospitalized COVID-19 patients with LENZ.

82.     Specifically, LENZ is intended to treat hospitalized COVID-19 patients suffering from CRS, an acute systemic inflammatory syndrome caused by the body's immune system overreacting to infection, and in result, suddenly discharging large quantities of inflammatory-inducing signaling molecules called cytokines. CRS can produce life-threatening symptoms such as fever, reduced heart function, multiple

organ dysfunction, and in some instances, total organ failure. In patients suffering from severe COVID-19, lung dysfunction is often triggered by CRS.

83.    To this end, before the Relevant Period, on April 15, 2020, Humanigen announced in a press release that the Company planned to enroll patients in the LIVE-AIR Study, an FDA-approved, multicenter, randomized, placebo-controlled, double-blind clinical trial of LENZ with the goal of preventing respiratory failure in hospitalized COVID-19 patients.

84.    Shortly thereafter, on May 6, 2020, Humanigen announced in a press release that a patient had received the first dose of LENZ in the LIVE-AIR Study. In the press release, Defendant Durrant stated, in relevant part:

> We are working with some of the top centers and clinicians in the US, alongside our contract research organization partner, CTI, to advance lenzilumab through Phase III with the intent to prevent serious and potentially fatal outcomes in high risk patients who are hospitalized with COVID-19… *As the only company working on prevention of cytokine storm through GM-CSF neutralization for nearly three years*, we have multiple accepted publications in this field, substantial safety data, including in patients with severe respiratory disease, and have filed extensive IP. We are grateful to FDA, CTI, other partners and our extensive network of recruitment centers in their support to enable recruitment of patients into this study as quickly as possible.

(Emphasis added.)

85.    On August 5, 2020, after the market closed, Humanigen filed a prospectus pertaining to the registration and/or resale of 82,563,584 shares of the Company's common stock for listing on the NASDAQ.

86.    Shortly thereafter, on September 22, 2020, the Company announced in a press release that it had completed its underwritten public offering of common stock. The Company raised proceeds of approximately $72.8 million from the sale of 9,200,000 shares in the offering. The press release further stated that the Company "intends to use the net proceeds from the offering to support its manufacturing, production, and commercial preparation activities relating to [LENZ] as a potential therapy for COVID-19 patients…"

87.    On May 28, 2021, before the market opened, Humanigen announced in a press release that the Company submitted the LENZ EUA to the FDA. The press release stated that "[t]his EUA application follows positive results from the LIVE-AIR Phase 3 clinical trial evaluating the ability of lenzilumab to improve the likelihood of survival without ventilation (SWOV) in newly hospitalized COVID-19 patients."

88.    Approximately two months later, on July 30, 2021, Humanigen announced in a press release that the NIAID advanced the ACTIV-5/BET-B Study to a Phase 2/3 study.

89.    On September 9, 2021, before the market opened, Humanigen revealed in a press release that the FDA rejected the LENZ EUA, in relevant part:

> [T]he U.S. FDA has declined its request for emergency use authorization of lenzilumab to treat newly hospitalized COVID-19 patients. In its letter, FDA stated that it was unable to conclude that the known and potential benefits of lenzilumab outweigh the known and

34

potential risks of its use as a treatment for COVID-19.

90.    In breach of their fiduciary duties to the Company, the Individual Defendants placed their own interests over the interests of Company shareholders, by misleading investors and the general public about the efficacy and general abilities of LENZ, thereby causing the Company's stock to trade at artificially inflated prices throughout the Relevant Period.

**<u>False and Misleading Statements Made During the Relevant Period</u>**

*<u>May 28, 2021 Press Release</u>*

91.    On May 28, 2021, before the market opened, Humanigen announced in a press release that the Company submitted the LENZ EUA to the FDA for approval, stating "[t]his EUA application follows positive results from the LIVE-AIR Phase 3 clinical trial evaluating the ability of lenzilumab to improve the likelihood of survival without ventilation (SWOV) in newly hospitalized COVID-19 patients."

92.    Additionally, the press release touted LENZ's ability to effectively treat hospitalized COVID-19 patients, in relevant part:

> Lenzilumab achieved the primary endpoint with a 54% relative improvement in the likelihood of SWOV compared to placebo. Lenzilumab also improved the relative likelihood of SWOV by 92% in subjects who received both corticosteroids and remdesivir and resulted in a 3-fold improvement in the likelihood of SWOV in patients with a CRP<150mg/L and less than 85 years of age. In these patients, a 2.2-fold improvement in the likelihood of survival was observed with lenzilumab.

*July 30, 2021 Press Release*

93.    On July 30, 2021, Humanigen announced in a press release that the NIH advanced the ACTIV-5/BET-B Study to a Phase 2/3 study. In the press release, Defendant Durrant stated, in relevant part: "We believe ACTIV-5/BET-B, along with LIVE-AIR, will provide the sufficient size and statistical power typically required for a [Biologics License Application ('BLA')] to be submitted to FDA."

*August 12, 2021 Press Release*

94.    On August 12, 2021, Humanigen announced in a press release its second quarter 2021 financial results. Among other things, the press release stated that since the Company submitted the LENZ EUA to the FDA, "the company has responded to several requests from the [FDA] regarding the application" and that "the company anticipates that ACTIV-5/BET-B may serve as a second confirmatory study required for submission to FDA as part of a [BLA] that the company would submit if the ACTIV-5/BET-B data further validate the benefits of lenzilumab in COVID-19 patients."

95.    Defendant Durrant exuded confidence in the August 12, 2021 press release, stating that "[w]e remain firm in our belief the results of our LIVE-AIR Phase 3 study warrant lenzilumab being granted [EUA]" and that "[t]he achievement of the primary endpoint for the overall patient population, and the recent supplemental subset analysis which showed significant response to treatment by

36

Black and African-American patients in the study, support our view of the potential benefit lenzilumab could bring to patient care if authorization were to be granted[.]"

### *August 12, 2021 10-Q*

96.    On the same day, the Company filed its quarterly report with the SEC for the period ended June 30, 2020 (the "2Q21 10-Q"). The 2Q21 10-Q was signed by Defendants Durrant and Morris, and contained certifications, signed by Defendant Durrant, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements contained in the 2Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

97.    The 2Q21 10-Q referenced the capabilities of LENZ in respect to treating patients with COVID-19 and CRS:

> Lenzilumab is a monoclonal antibody that has been demonstrated to neutralize GM-CSF, a cytokine that the Company believes is of critical importance in the hyperinflammatory cascade, sometimes referred to as cytokine release syndrome ('CRS') or cytokine storm, associated with COVID-19," and that "[t]he Company believes the results from its Phase 3 study in COVID-19, its Phase 1b study in CAR-T, and four other clinical trials support the mechanism of action of lenzilumab.

98.    The 2Q21 10-Q further elaborated on LENZ's performance in the LIVE-AIR Study, in relevant part:

> On May 5, 2021, data from a Phase 3, multi-center, double-blind, placebo-controlled potential registrational trial of lenzilumab as a

potential therapeutic for hospitalized, hypoxic patients with COVID-19 pneumonia was published on MedRxiv, a non-peer reviewed journal. We refer to this study as the "LIVE-AIR" study. Data from LIVE-AIR support the previously reported primary endpoint that demonstrated lenzilumab improved the likelihood of survival without ventilation ("SWOV"), sometimes referred to as "ventilator-free survival", by 54% in the modified intent-to-treat ("mITT") population . . . . SWOV also improved on a relative basis by 92% in subjects who received both corticosteroids and remdesivir . . .; by 3.04-fold in subjects with baseline C-reactive protein ("CRP") levels < 150 mg/L at baseline[.]

99.   The statements contained in ¶¶ 91-98 were materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) certain of the Company's financial statements were false and unreliable; (2) LENZ's efficacy in treating hospitalized COVID-19 was overstated and the ACTIV-5/BET-B Study would not meet its primary endpoint; (3) as a result, it was unlikely the FDA would approve the LENZ EUA; (4) LENZ was not the only purported treatment undergoing clinical studies during the Relevant Period; and (5) the Company failed to maintain adequate internal controls. As a result, the Company's public statements were materially false and misleading.

## The Truth Begins to Emerge While False and Misleading Statements Continue

100.   On September 9, 2021, before the market opened, the Company announced in a press release (the "September 9, 2021 Press Release") that the FDA denied the LENZ EUA. The press release stated, in relevant part:

38

[T]he U.S. FDA has declined its request for emergency use authorization of lenzilumab to treat newly hospitalized COVID-19 patients. In its letter, FDA stated that it was unable to conclude that the known and potential benefits of lenzilumab outweigh the known and potential risks of its use as a treatment for COVID-19.

101.   The September 9, 2021 Press Release further stated that "NIH's ACTIV-5/BET-B study is expected to provide further data that may support a new EUA request" and that the Company "remains committed to completing regulatory processes underway seeking Marketing Authorization for lenzilumab to treat hospitalized COVID-19 patients in the U.K. and other territories[.]"

102.   The September 9, 2021 Press Release contained a statement from Defendant Durrant, reassuring investors that the Company "remain[s] committed to bringing lenzilumab to patients hospitalized with COVID-19" and that "[w]e believe the ongoing ACTIV-5/BET-B trial, which has been advanced to enroll up to 500 patients, may provide additional safety and efficacy data sufficient to support our efforts to obtain an EUA to treat hospitalized COVID-19 patients."

103.   On this news, the price per share of the Company's common stock fell $7.14 per share from its close price of $15.11 on September 8, 2021 to close at $7.97 per share on September 9, 2021, a decline of approximately 47.25%.

### November 12, 2021 Press Release

104.   On November 12, 2021, the Company announced in a press release its third quarter of 2021 financial results, as well as a general business update. The press

release contained a statement from Defendant Durrant regarding LENZ's status, in relevant part: "We are continuing our efforts to get lenzilumab to hospitalized COVID-19 patients. The recent selection of lenzilumab by the European Commission as one of the 10 most promising treatments for COVID-19, validates our view that lenzilumab offers meaningful clinical potential."

### November 12, 2021 10-Q

105.    On the same day, the Company filed its quarterly report with the SEC for the period ended September 30, 2021 (the "3Q21 10-Q"). The 3Q21 10-Q was signed by Defendants Durrant and Morris, and contained SOX certifications, signed by Defendants Durrant and Morris, attesting to the accuracy of the financial statements contained in the 3Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

106.    The 3Q21 10-Q contained substantively similar statements that were previously made pertaining to LENZ's alleged efficacy and capabilities in the 2Q21 10-Q, as referenced in ¶¶ 96-98.

107.    Yet, the 3Q21 10-Q elaborated on the FDA's denial of the LENZ EUA, stating that the Company "requested and…been granted a Type B meeting with the FDA." In the meeting request Humanigen sent to the FDA was "day 60 data as well as detailed CRP analysis from the LIVE-AIR study." The 3Q21 10-Q further stated

that the Company "intend[s] to submit a [BLA] to FDA for lenzilumab in the treatment of hospitalized COVID-19 patients" and that the Company "plan[s] to include the results of the expanded ACTIV-5/BET-B study as a basis for a BLA-confirmatory study for lenzilumab and believe data from ACTIV-5/BET-B, along with LIVE-AIR, should provide the sufficient size and statistical power typically required for a BLA to be submitted to FDA."

### The Truth Continues to Emerge While False and Misleading Statements Continue

108.   On December 28, 2021, Kiniksa Pharmaceuticals, Ltd., a global biopharmaceutical company founded in Bermuda in 2015, announced results from a Phase 3 trial of its drug candidate, mavrilimumab (the "Kiniksa Trial"). The Kiniksa Trial for mavrilimumab was remarkably like Humanigen's drug trials for LENZ. Like LENZ, mavrilimumab was a fully human monoclonal antibody that attacked granulocyte macrophage colony stimulating factor receptor alpha ("GM-CSFR$a$"). Kiniksa Pharmaceutical's press release stated that "the Phase 3 portion of the Phase 2/3 trial of mavrilimumab in COVID-19-related acute respiratory syndrome (ARDS) did not meet the primary efficacy endpoint."

109.   In contravention of the Defendants' statements, the Kiniksa Trial proved that LENZ was not the "only immunomodulator that was in an active clinical trial in another indication to prevent cytokine storm prior to embarking upon the

Phase III COVID-19 trial" and was not the "only agent in an active Phase III trial targeting GM-CSF."

110.  In result, when Kiniksa Pharmaceuticals' GM-CSF drug candidate failed, the Defendants lost credibility about the efficacy and commercial viability of LENZ in the eyes of investors and the general public.

*January 5, 2022 Press Release*

111.  On January 5, 2022, the Company announced in a press release that enrollment in Phase 2/3 of the ACTIV-5/BET-B Study had completed. The press release contained a statement from Defendant Durrant praising the progress made regarding LENZ, in relevant part:

> Completion of target enrollment in ACTIV-5/BET-B is a significant milestone in the development of lenzilumab . . . . We have alignment with the FDA that, if the trial is successful, we can include the results from ACTIV-5/BET-B in an amended [EUA] submission for lenzilumab for hospitalized patients with COVID-19. We look forward to sharing the topline results from ACTIV-5, when available, and submitting an amended EUA.

*March 1, 2022 10-K*

112.  On March 1, 2022, the Company filed its annual report for the 2021 Fiscal Year on Form 10-K with the SEC (the "2021 10-K"). The 2021 10-K was signed by Defendants Durrant,  Morris, Barliant, Boehm, Buxton, Chappell, Hohneker, and Xie and contained SOX certifications, signed by Defendants Durrant and Morris, attesting to the accuracy of the financial statements contained in the

2021 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

113.    In respect to LENZ, the 2021 10-K stated that "[l]enzilumab is a monoclonal antibody that has been demonstrated to neutralize . . . a cytokine that we believe is of critical importance in the hyperinflammatory cascade, sometimes referred to as cytokine release syndrome ('CRS') or cytokine storm, associated with COVID-19[.]"

114.    The 2021 10-K also addressed LENZ's future, stating, among other things, that "[d]espite . . . regulatory setbacks, we continue to believe in [lenzilumab's] potential therapeutic benefits and remain committed to bringing lenzilumab to patients hospitalized with COVID-19." Specifically, the 2021 10-K provided that the Company's "[n]ext anticipated step in our development program for lenzilumab in COVID-19 is the release of results from the . . . ACTIV-5/BET-B trial." If results from the ACTIV-5/BET-B Study results confirm the results of the CRP subgroup from the LIVE-AIR study, the Company "plan[s] to include the results from ACTIV-5/BET-B in an amendment to EUA submission."

115.    The 2021 10-K further stated that the Company "believe[s] that we have built a strong intellectual property position in the area of GM-CSF neutralization through multiple approaches and mechanisms, as they pertain to COVID-19[.]"

43

*April 12, 2022 Proxy Statement*

116.   On April 12, 2022, the Company filed the 2022 Proxy Statement. Defendants Durrant, Barliant, Boehm, Buxton, Chappell, Hohneker, and Xie solicited the 2022 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

117.   The 2022 Proxy Statement called for Company shareholders to, *inter alia*: (1) ratify Horne LLP as the Company's registered public accounting firm; (2) approve, on an advisory basis, the compensation of named executive officers; and (3) reelect Defendants Durrant, Boehm, Barliant, Buxton, Chappell, Hohneker, and Xie to serve as directors of the Board.

118.   The 2022 Proxy Statement stated the following regarding the Board's and the Audit Committee's risk oversight functions:

> Our Board takes an active role in overseeing management of the Company's risks, both through its own consideration of risks associated with our business and strategic initiatives and through its committees' consideration of various risks applicable to that committee's areas of focus. In particular, our Board is responsible for monitoring and assessing strategic risk exposure and our audit committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. The audit committee also monitors compliance with legal and regulatory requirements.

119.   The 2022 Proxy Statement also listed certain responsibilities of the Audit Committee, which at that time consisted of Defendants Xie (as Chair), Boehm,

44

and Buxton. These responsibilities included: (1) "appointing, approving the compensation of, and assessing the independence of our registered public accounting firm;" (2) "overseeing the work of our registered public accounting firm, including through the receipt and consideration of reports from such firm;" (3) "reviewing and discussing with management and the registered public accounting firm our annual and quarterly financial statements and related disclosures;" (4) "monitoring our internal control over financial reporting and our disclosure controls and procedures;" and (5) "overseeing our risk assessment and risk management policies."

120.    The 2022 Proxy Statement was materially misleading because it failed to disclose that: (1) contrary to the 2022 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and Audit Committee were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (2) the Individual Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder advisory approval of the executive officers' compensation plan.

121.    The 2022 Proxy Statement also failed to disclose that: (1) certain of the Company's financial statements were false and unreliable; (2) LENZ's efficacy in

treating hospitalized COVID-19 was overstated and the ACTIV-5/BET-B Study would not meet its primary endpoint; (3) as a result, it was unlikely the FDA would approve the LENZ EUA; (4) LENZ was not the only purported treatment undergoing clinical studies during the Relevant Period; and (5) the Company failed to maintain adequate internal controls. As a result, the 2022 Proxy Statement was materially false and misleading.

122.    As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company shareholders, *inter alia*: (1) ratified Horne LLP as the Company's registered public accounting firm; (2) approved, on an non-binding advisory basis, the compensation of named executive officers; and (3) reelected Defendants Durrant, Boehm, Barliant, Buxton, Chappell, Hohneker, and Xie to the Board, who breached their fiduciary duties to the Company.

### May 5, 2022 Press Release

123.    On May 5, 2022, the Company announced in a press release its first quarter of 2022 financial results. The press release contained a statement from Defendant Durrant regarding LENZ's status, in relevant part:

> A key highlight of the first quarter was the completion of enrollment in the ACTIV-5/BET-B study. We also held a productive Type B preEUA meeting with FDA where we gained alignment on the data and statistical analysis plan to be included as part of the amendment to our EUA for [lenzilumab] in COVID-19 patients. In concert with the NIH, we anticipate top-line data in the primary analysis population to be reported in the second quarter, with an amendment to our EUA submission planned to follow[.]

*May 5, 2022 10-Q*

124.   On the same day, the Company filed its quarterly report with the SEC for the period ended March 31, 2022 (the "1Q22 10-Q"). The 1Q22 10-Q was signed by Defendants Durrant and Morris, and contained SOX certifications, signed by Defendants Durrant and Morris, attesting to the accuracy of the financial statements contained in the 1Q22 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

125.   1Q22 10-Q continued to purport that "[l]enzilumab is a monoclonal antibody that has been demonstrated to neutralize . . . a cytokine that we believe is of critical importance in the hyperinflammatory cascade, sometimes referred to as cytokine release syndrome ('CRS') or cytokine storm, associated with COVID-19[.]"

126.   The 1Q22 10-Q also addressed LENZ's future, stating, among other things, that "[t]he next anticipated step in the Company's development program for lenzilumab in COVID-19 is the release of results from the . . . ACTIV-5/BET-B trial," and that if "confirmatory of the findings of the CRP subgroup from the Company's LIVE-AIR study, the Company plans to include the results from ACTIV-5/BET-B in an amendment to its [EUA] submission to the [FDA.]"

127.   The statements contained in ¶¶ 111-115 and 123-126 were materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) certain of the Company's financial statements were false and unreliable; (2) LENZ's efficacy in treating hospitalized COVID-19 was overstated and the ACTIV-5/BET-B Study would not meet its primary endpoint; (3) as a result, it was unlikely that the FDA would approve the LENZ EUA; (4) LENZ was not the only purported treatment undergoing clinical studies during the Relevant Period; and (5) the Company failed to maintain adequate internal controls. As a result, the Company's public statements were materially false and misleading.

## **The Truth Fully Emerges**

128.   The truth fully emerged after markets closed on July 12, 2022, when the Company issued a press release announcing that LENZ failed to achieve statistical significance on the primary endpoint of the ACTIV-5/BET-B Study. The press release stated, in relevant part:

> Humanigen . . . has been informed of preliminary topline results from the National Institute of Allergy and Infectious Diseases' (NIAID) ACTIV-5/BET-B trial evaluating lenzilumab plus remdesivir versus placebo plus remdesivir in hospitalized COVID-19 patients. The trial did not achieve statistical significance on the primary endpoint . . . . The data also showed a non-significant trend toward a reduction in mortality in the overall patient population[.]

48

129.   On this news, the price per share of the Company's common stock fell $2.38 per share from its close price of $2.99 per share on July 12, 2022 to close at $0.61 per share on July 13, 2022, a decline of approximately 79.6%.

## DAMAGES TO HUMANIGEN

130.   As a direct and proximate result of the Individual Defendants' misconduct, Humanigen has lost and will continue to lose and expend many millions of dollars.

131.   Such expenditures include, but are not limited to, the fees associated with the Securities Class Action filed against the Company and the Company's CEO, Chairman of the Board, CFO, COO, CSO and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

132.   Such expenditures also include, but are not limited to, the costs incurred by the Company in restating its previous financial statements.

133.   Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

134.   As a direct and proximate result of the Individual Defendants' conduct, Humanigen has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future

due to the Company's and its misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

135. Plaintiff brings this action derivatively and for the benefit of Humanigen to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Humanigen, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

136. Humanigen is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

137. Plaintiff is, and has been at all relevant times, a shareholder of Humanigen. Plaintiff will adequately and fairly represent the interests of Humanigen in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

138. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

139. A pre-suit demand on the Board of Humanigen is futile and, therefore,

excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Durrant, Boehm, Barliant, Buxton, Chappell, Xie, and Hohneker (the "Directors"). Plaintiff needs only to allege demand futility as to four of seven Directors who are on the Board at the time this action is commenced.

140.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

141.   In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the foregoing schemes. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. Moreover, the Directors caused the Company to fail to maintain internal controls over financial reporting and to fail to maintain effective disclosure controls and procedures. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

142.   Additional reasons that demand on Defendant Durrant is futile follow. Defendant Durrant has served as the Chairman of the Board since January 2016 and

as the CEO since March 2016. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Durrant with his principal occupation for which he receives handsome compensation. As a trusted Company officer and director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Durrant signed, and thus personally made, the false and misleading statements contained in the 2022 10-K. Moreover, the 2022 Proxy Statement was solicited on his behalf and the false and misleading statements contained therein contributed to his reelection to the Board. Moreover, Defendant Durrant is a defendant in the Securities Class Action. For these reasons, Defendant Durrant breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143.    Additional reasons that demand on Defendant Boehm is futile follow. Defendant Boehm has served as a Company director since February 2018. Defendant Boehm signed, and thus personally made, the false and misleading statements contained in the 2022 10-K. Moreover, the 2022 Proxy Statement was solicited on his behalf and the false and misleading statements contained therein contributed to his reelection to the Board. As a director throughout the Relevant Period, he

conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he served as a member of Humanigen's Audit Committee and, in that capacity, he failed to oversee, *inter alia*, the integrity of the Company's financial statements, the Company's internal control over financial reporting, and the effectiveness of its disclosure controls and procedures, as he was required to do under the Audit Committee Charter. For these reasons, Defendant Boehm breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

144.   Additional reasons that demand on Defendant Barliant is futile follow. Defendant Barliant has served as a Company director since January 2016. He currently serves as a member of the Nominating and Corporate Governance Committee. Defendant Barliant signed, and thus personally made, the false and misleading statements contained in the 2022 10-K. The 2022 Proxy Statement was solicited on his behalf and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal

controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Barliant breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145.   Additional reasons that demand on Defendant Buxton is futile follow. Defendant Buxton has served as a Company director since December 2019. She also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. Defendant Buxton signed, and thus personally made, the false and misleading statements contained in the 2022 10-K. The 2022 Proxy Statement was solicited on her behalf and the false and misleading statements contained therein contributed to her reelection to the Board. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, she served as a member of Humanigen's Audit Committee and, in that capacity, she failed to oversee, *inter alia*, the integrity of the Company's financial statements, the Company's internal control over financial reporting, and the effectiveness of its disclosure controls and procedures, as she was required to do under the Audit Committee Charter. For these reasons, Defendant Buxton breached her fiduciary duties, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

146.    Additional reasons that demand on Defendant Chappell is futile follow. Defendant Chappell has served as a Company director since February 2021 and as the CSO since July 2020. Defendant Chappell signed, and thus personally made, the false and misleading statements contained in the 2022 10-K. The 2022 Proxy Statement was solicited on his behalf and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Chappell is a defendant in the Securities Class Action. For these reasons, Defendant Chappell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

147.    Additional reasons that demand on Defendant Xie is futile follow. Defendant Xie has served as a Company director since October 2021. Defendant Xie signed, and thus personally made, the false and misleading statements contained in the 2022 10-K. The 2022 Proxy Statement was solicited on his behalf and the false

and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Xie breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148. Additional reasons that demand on Defendant Hohneker is futile follow. Defendant Hohneker has served as a Company director since October 2021. Defendant Hohneker signed, and thus personally made, the false and misleading statements contained in the 2022 10-K. The 2022 Proxy Statement was solicited on his behalf and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Hohneker breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

56

149.   Additional reasons that demand on the Board is futile follow.

150.   The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

151.   The Audit Committee Defendants, consisting of Defendants Xie, Boehm, and Buxton, served as members of Humanigen's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for, *inter alia*, overseeing accounting and financial reporting processes, and reviewing and discussing with management major issues regarding accounting principles and financial statement presentations, as well as major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies. The Audit Committee Defendants failed to adequately oversee the Company's reporting processes, failed to remediate major issues regarding accounting principles, financial statement presentations, and identify or remedy deficiencies with the Company's internal controls, and failed prevent the Company from issuing false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their

fiduciary duties, are not disinterested, and demand is excused as to them.

152. Demand in this case is further excused because the Directors are beholden to Defendant Chappell, who is a Company director, officer, and significant stakeholder in the Company. Defendant Chappell beneficially owns approximately 12.6 million shares of Company common stock as of April 5, 2022, or 18.0%. Thus, his substantial holdings and his continued presence on the Board and as the Company's CSO make him a significant shareholder who exercises outsized voting power on almost all facets of the Company. In light of Defendant Chappell's significant control of the Company, the Directors cannot impartially consider a demand against Defendant Chappell, an interested, primary wrongdoer, as their continued employment with the Company is partly contingent on Defendant Chappell's decisions. Thus, the Directors are unable to evaluate a demand with disinterest or independence as a result of Defendant Chappell's significant voting influence.

153. The Directors violated the Code, Company policy, and the Company's corporate governance documents by engaging in or permitting the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, violations of the Exchange Act,

and failing to report the same. Further in violation of the Code and the Company's policies, the Individual Defendants failed to maintain internal controls, failed to maintain the accuracy of Company records and reports, and failed to comply with applicable laws and regulations.

154.   In violation of Humanigen's Audit Committee Charter, the Audit Committee Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of Humanigen's Audit Committee Charter, the Audit Committee Defendants failed to adequately oversee major issues regarding the Company's accounting principles and financial statement presentations and major issues related to the adequacy of the Company's internal controls, including the Company's internal control over financial reporting and disclosure controls and procedures.

155.   The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for the Company the damages the

Company suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

156.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

157.   The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

158.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of the Company. If there is a directors' and officers' liability insurance policy covering the

Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Directors or certain of the officers of the Company, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

159.  If there is no directors' and officers' liability insurance, then the Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

160.  Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Defendants Durrant, Morris, Boehm, Barliant, Buxton, Chappell, Xie, and Hohneker for Violations of Section 14(a) of the Exchange Act**

161.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

162.  Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

163.  Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

164.  Under the direction and watch of Defendants Durrant, Morris, Boehm, Barliant, Buxton, Chappell, Xie, and Hohneker the 2022 Proxy Statement failed to

disclose, *inter alia*: (1) contrary to the 2022 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and Audit Committee were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (2) the Individual Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder advisory approval of the executive officers' compensation plan.

165.   The 2022 Proxy Statement also failed to disclose that: (1) certain of the Company's financial statements were false and unreliable; (2) LENZ's efficacy in treating hospitalized COVID-19 was overstated and the ACTIV-5/BET-B Study would not meet its primary endpoint; (3) as a result, it was unlikely the FDA would approve the LENZ EUA; (4) LENZ was not the only purported treatment undergoing clinical studies during the Relevant Period; and (5) the Company failed to maintain adequate internal controls. As a result, the 2022 Proxy Statement was materially false and misleading.

166.   In the exercise of reasonable care, the Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement was materially false and

63

misleading. The false and misleading elements of the 2022 Proxy Statement led Company shareholders to, among other things: (1) ratify Horne LLP as the Company's registered public accounting firm; (2) approve, on a non-binding advisory basis, the compensation of named executive officers; and (3) reelect Defendants Durrant, Boehm, Barliant, Buxton, Chappell, Xie, and Hohneker to serve as directors of the Board.

167.    The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the 2022 Proxy Statement.

168.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

169.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

170.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

171.    Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

172.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as

alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the Company's rights and interests.

In breach of their fiduciary duties owed to the Company, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's statements about LENZ's efficacy in treating hospitalized COVID-19 patients were false and unreliable; (2) consequently, it was not likely that the FDA would approve the LENZ EUA; (3) likewise, it was not likely that the ACTIV/BET-B Study would reach its primary endpoint; (4) as a result, LENZ's commercial and clinical viability was grossly exaggerated; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

173.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

174.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls and effective disclosure controls and procedures.

175.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

176.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

177.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, the Company has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

178.   Plaintiff on behalf of the Company has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Unjust Enrichment

179.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

180.  By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

181.  The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance or artificially inflated valuation of the Company, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

182.  Plaintiff, as a shareholder and a representative of the Company, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

183.  Plaintiff on behalf of the Company has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Abuse of Control

184.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

185.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

186.   As a direct and proximate result of the Individual Defendants' abuse of control, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

187.   Plaintiff on behalf of the Company has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

188.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

189.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly-held corporation.

190.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained and will continue to sustain significant damages.

191.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

192.   Plaintiff on behalf of the Company has no adequate remedy at law.

### SIXTH CLAIM

**Against the Individual Defendants for Waste of Corporate Assets**

193.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

194.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

195.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused the Company to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

196.   As a result of the waste of corporate assets, the Individual Defendants

and are each liable to the Company.

197.   Plaintiff on behalf of the Company has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Durrant and Morris for Contribution Under Sections 10(b) and 21D of the Exchange Act

198.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

199.   The Company and Defendants Durrant and Morris are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Durrant and Morris's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

200.   Defendants Durrant and Morris, because of their positions of control and authority as the Company's CEO, Chairman of the Board, CFO, COO, and member of the Board, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

201.   Accordingly, Defendants Durrant and Morris are liable under 15 U.S.C.

§ 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

202.   As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Durrant and Morris.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Humanigen, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to the Company;

(c)   Determining and awarding to the Company the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing the Company and the Individual Defendants to take all necessary actions to reform and improve the Company corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including,

but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of the Company to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding the Company restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: January 17, 2023                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Laurence M. Rosen*
Laurence M. Rosen
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 313-1887
Facsimile: (973) 833-0399
Email: lrosen@rosenlegal.com

Phillip Kim
Erica L. Stone
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
Email: estone@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, In Chul Yang am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __th day of _____, 2022.

1/9/2023

In Chul Yang