**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 313-1887
Facsimile: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN CHUL YANG, derivatively on behalf of HUMANIGEN, INC., | |
| Plaintiff, | Case No.: 2:23-cv-00235-KM-LDW |
| v. | |
| CAMERON DURRANT, RAINER BOEHM, RONALD BARLIANT, CHERYL BUXTON, DALE CHAPPELL, KEVIN XIE, and JOHN HOHNEKER, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| HUMANIGEN, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## **INTRODUCTION**

Plaintiff In Chul Yang ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Humanigen, Inc. ("Humanigen," or the "Company"), files this Verified Amended Shareholder Derivative Complaint against Defendants Cameron Durrant ("Durrant"), Rainer Boehm ("Boehm"), Ronald Barliant ("Barliant"), Cheryl Buxton ("Buxton"), Dale Chappell ("Chappell"), Kevin Xie ("Xie"), and John Hohneker ("Hohneker") (collectively, the "Individual Defendants" and with the Company, "Defendants") for breaches of their fiduciary duties as directors and/or officers of the Company, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; against Defendants Durrant, Boehm, Barliant, Buxton, Chappell, Xie, and Hohneker for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); and against Defendants Durrant and Chappell for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings,

wire and press releases published by and regarding the Company, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the directors and officers of Humanigen from May 16, 2020 to July 12, 2022, both dates inclusive (the "Relevant Period").

2.      Humanigen is a clinical-stage biopharmaceutical company headquartered in Short Hills, New Jersey. The Company was founded in 2000 in California and reincorporated in Delaware in September 2001 as KaloBios Pharmaceuticals, Inc. In November 2015, Martin "Pharma Bro" Shkreli purchased a majority stake in the Company and became its Chief Executive Officer ("CEO").

3.      Approximately a month later, on December 17, 2015, Shkreli was arrested by the FBI for securities fraud. The Company subsequently declared bankruptcy and started a lengthy restructuring process that continued until August 2017, when the Company changed its name to Humanigen, Inc. At that time, Defendant Durrant, who already loaned Humanigen more than $18 million to keep it afloat, became the Company's controlling shareholder and assumed the role of

CEO.

4.     However, despite the extensive restructuring efforts, Humanigen's prospects were dismal; by December 31, 2019, the Company lacked enough capital to maintain operations for the following year. Consequently, Humanigen's auditors indicated they harbored "substantial doubt" about Humanigen's "ability to continue as a going concern."

5.     For years, Humanigen's business consisted of developing an immunomodulatory antibody drug candidate called lenzilumab ("LENZ"), intended to treat cancer. Specifically, Humangien researched LENZ to treat cancer patients experiencing cytokine release syndrome ("CRS" or "cytokine storm") as a side effect of chemotherapy. CRS occurs when the immune system produces a sudden large discharge of inflammatory causing signaling molecules called cytokines.

6.     CRS is triggered by the production of granulocyte macrophage-colony stimulating factor ("GM-CSF"). CRS is an acute systemic inflammatory syndrome marked by fever and multiple organ dysfunction, and sometimes, total organ failure. LENZ was designed to halt GM-CSF production, and therefore stop CRS from occurring.

7.     However, when COVID-19 gripped the world by March 2020, the Company quickly announced LENZ as a COVID-19 treatment. Indeed, within days, the Company shifted its clinical development focus to researching LENZ for

COVID-19 treatment to attain an Emergency Use Authorization from the United States Food and Drug Administration ("FDA"). For perspective, the United States declared a national emergency for COVID-19 on March 13, 2020. Just three days later, on March 16, 2020, in the Company's annual report to the SEC on Form 10-K, Humanigen revealed that the Company was "exploring the potential for use of lenzilumab to prevent the emergence of [cytokine storm] in COVID [patients]." And just four days after that announcement, on March 20, 2020, Humanigen announced it already began planning a Phase III clinical study regarding COVID-19.

8. Humanigen represented to investors that "recent data from China" and "pre-publication" articles supported the "scientific rationale" for using LENZ to treat COVID-19 patients. However, the Individual Defendants neglected to inform investors in their public statements that GM-CSF was necessary for proper lung function. Indeed, both medical and academic publications indicated that GM-CSF is vital for lung alveoli in the lungs to function properly so as to aid in the exchange of oxygen and carbon dioxide. Therefore, inapposite to Individual Defendants' representations, LENZ could be dangerous if given to COVID-19 patients who already suffered from respiratory system complications as it would greatly reduce the presence of GM-CSF in the lungs.

9. Despite this knowledge, Individual Defendants concealed the truth to win an Emergency Use Authorization from the FDA to pull the Company out of

4

financial distress. Throughout the Relevant Period, the Company represented that LENZ produced "positive results" in multiple trials and studies, that LENZ improved the likelihood of survival without ventilation ("SWOV") in recently hospitalized COVID-19 patients, and that LENZ was the only GM-CSF drug candidate undergoing a Phase 3 trial while simultaneously raising more than $300 million through public offerings, pushing Humanigen off the brink of insolvency.

10.     Humanigen strung investors along by consistently touting the "scientific rationale" of using LENZ for COVID-19 treatment by releasing information about its clinical studies. One of the studies was sponsored directly by Humanigen and sought to assess whether the use of LENZ, alongside current standards of care, could alleviate CRS and improve SWOV in hospitalized COVID-19 patients (the "LIVE-AIR Study"). The LIVE-AIR Study launched on May 5, 2020, and was a randomized, double-blind, multicenter, placebo-controlled phase 3 trial.

11.     The National Institute of Health, through the National Institute of Allergy and Infectious Diseases, sponsored another study, titled the Accelerating Covid-19 Therapeutic Interventions and Vaccines study ("ACTIV-5/BET-B Study"). In this study, researchers evaluated the performance of LENZ and remdesivir together versus a placebo and remdesivir together in hospitalized COVID-19 patients. This study sought to achieve "statistical significance on the

primary endpoint," which was defined as the "proportion of patients with baseline CRP<150mg/L and age<85 years, alive and without mechanical ventilation" through twenty-nine days.

12.     On April 5, 2021, the Company held a public offering of stock, selling 5.4 million shares for aggregate proceeds exceeding $100 million. A few weeks later, in May 2021, Humanigen applied to the FDA seeking Emergency Use Authorization for LENZ for hospitalized COVID-19 patients (the "LENZ EUA").

13.     The truth began to emerge on September 9, 2021, when Humanigen announced, through a press release, that the FDA rejected the LENZ EUA. The press stated that the FDA "was unable to conclude that the known and potential benefits of lenzilumab outweigh the known and potential risks of its use as a treatment for COVID-19."

14.     On this news, the price per share of the Company's common stock fell $7.14 per share, or approximately 47.25%, from closing at $15.11 per share on September 8, 2021, to close at $7.97 per share on September 9, 2021.

15.     Despite this news, the Individual Defendants continued to mislead investors by asserting that LENZ EUA approval would be possible after submission of clinical data from the National Institute of Allergy and Infectious Diseases' ACTIV-5/BET-B Study.

16.     However, the truth continued to emerge on December 28, 2021, when

Kiniksa Pharmaceuticals, Ltd., announced that its developmental drug, mavrilimumab, produced lackluster results in its Phase 3 trial. Mavrilimumab aimed to treat acute respiratory syndrome caused by COVID-19. Both Kiniksa's Mavrilimumab and Humanigen's LENZ were GM-CSF therapeutics intended to treat the same diseases. Despite this, the Company told investors throughout the Relevant Period that LENZ was the only drug candidate in development intended to treat these ailments.

17.     The truth fully emerged on July 12, 2022, when Humanigen announced that LENZ lacked statistical significance on the primary endpoint of the National Institute of Allergy and Infectious Diseases' ACTIV-5/BET-B Study.

18.     On this news, the price per share of the Company's common stock fell $2.38 per share, or approximately 79.6%, from closing at $2.99 per share on July 12, 2022, to close at $0.61 per share on July 13, 2022.

19.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements and omissions about the true efficacy and safety of LENZ and concealed the true commercial viability of LENZ. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make to the investing public certain false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) certain of

the Company's financial statements were false and unreliable; (2) LENZ's efficacy in treating hospitalized COVID-19 was overstated and the ACTIV-5/BET-B Study would not meet its primary endpoint; (3) additionally, the LIVE-AIR Study did not give Humanigen enough patient safety data to support approval of the LENZ EUA; (4) as a result, it was extremely unlikely the FDA would approve the LENZ EUA; (5) a large amount of both medical and academic data already stated that GM-CSF was integral to proper lung function, contrary to the Company's "hypothesis" from "pre-publication papers" that reducing GM-CSF would help COVID-19 patients; (6) LENZ was not the only purported treatment undergoing clinical studies during the Relevant Period; and (7) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

20.    The Individual Defendants' misrepresentations had the effect of misleading the investing public and artificially inflating the Company's stock during the Relevant Period.

21.    In further breach of their fiduciary duties to the Company, two of the Individual Defendants engaged in lucrative inside trading, selling over $70 million of common stock when the price of the Company's common stock was artificially inflated as a result of the Individual Defendants' misconduct.

22.    At all relevant times, the Individual Defendants further breached their

8

fiduciary duties by causing the Company to fail to maintain effective disclosure controls and procedures and adequate internal controls.

23.   In light of the Individual Defendants' misconduct—which has subjected the Company, its CEO, its Chairman of the Board and its Chief Scientific Officer ("CSO") to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the District of New Jersey (the "Securities Class Action") which has further subjected the Company to the need to undertake intake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

24.   In light of the breaches of fiduciary duty by the Individual Defendants, seven of whom constitute the entirety of the Company's current Board, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants Durrant and Chappell's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, the Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on the Company's

behalf with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

26.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

27.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

28.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

29.     Plaintiff is a current shareholder of the Company. Plaintiff has continuously held Company common stock at all relevant times.

**Nominal Defendant Humanigen**

30.    Humanigen is a Delaware corporation with its principal executive offices at 830 Morris Turnpike, 4th Floor, Short Hills, New Jersey, 07078. Since September 22, 2020, the Company's common stock trades on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "HGEN." Prior to September 22, 2020, the Company's common stock traded on the OTCQB Venture Market ("OTCQB") under the symbol "HGEND."

**Defendant Durrant**

31.    Defendant Durrant is and has been the CEO and Chairman of the Board since March 2016 and January 2016, respectively. He also served as Humanigen's interim CFO from July 1, 2019 to July 31, 2020. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 12, 2022 (the "2022 Proxy Statement"), as of April 5, 2022, Defendant Durrant beneficially owned 2,190,648 shares of the Company's common stock, or 3.0% of the Company's total outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 5, 2022 was $10.19, Defendant Durrant owned approximately $22.3 million worth of Company stock at that time.

32.    For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Durrant received $2,435,314 in total compensation from the Company. This included $600,000 in salary, $160,000 in option awards, and $1,675,314 in non-

11

equity incentive plan compensation. For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Durrant received $9,717,751 in total compensation from the Company. This included $640,000 in salary, $8,874,712 in option awards, and $203,039 in non-equity incentive plan compensation.[1]

33.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Durrant made the following sale of company stock at artificially inflated prices:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|------|-------------|----------------------|----------|
| June 14, 2021 | 81,441 | $20.78 | $1,692,344 |

Thus, in total, before the fraud was exposed, he sold 81,441 shares of Company common stock at artificially inflated prices on inside information, for which he received approximately $1,692,344. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

34.     The 2022 Proxy Statement stated the following about Defendant

---

[1] The Company's executive compensation for the fiscal year ended December 31, 2022 is not yet available. In Humanigen's March 30, 2023 10-K, the Company states that executive compensation will be provided in the Company's 2023 proxy statement if the proxy statement is published within 120 days of December 31, 2022.

Durrant:

> ***Cameron Durrant, M.D., MBA***, has served as our Chairman of our
> Board since January 2016, and as our Chief Executive Officer since
> March 2016. In addition, Dr. Durrant served as our Interim Chief
> Financial Officer from July 1, 2019 to July 31, 2020. From May 2014
> to January 2016, Dr. Durrant served as Founder and Director of Taran
> Pharma Limited, a private semi-virtual specialty pharma company
> developing and registering treatments in Europe for orphan conditions.
> Dr. Durrant served as President and Chief Executive Officer of ECR
> Pharmaceuticals Co., Inc., a subsidiary of Hi-Tech Pharmacal Co., Inc.,
> from September 2012 to April 2014 until its acquisition by Akorn. He
> previously has been a senior executive at Johnson and Johnson,
> Pharmacia Corporation, GSK and Merck. Dr. Durrant was a director of
> Immune Pharmaceuticals Inc. from July 2014 to September 2018 and
> serves on the boards of directors of two privately held healthcare
> companies. Dr. Durrant earned his medical degree from the Welsh
> National School of Medicine, Cardiff, UK, his DRCOG from the Royal
> College of Obstetricians and Gynecologists, London, UK, his MRCGP
> from the Royal College of General Practitioners, London, UK, and his
> MBA from Henley Management College, Oxford, UK. Dr. Durrant
> brings to the Board extensive experience as a pharma/biotech
> entrepreneur, operating executive and board member, as well as his
> day-to-day operating experience as our Chief Executive Officer.

### **Defendant Boehm**

35.     Defendant Boehm has served as a Company director since February
2018. He is also the Chair of the Nominating and Corporate Governance Committee
and a member of the Audit Committee. According to the 2022 Proxy Statement, as
of April 5, 2022, Defendant Boehm beneficially owned 185,553 shares of the
Company's common stock. Given that the price per share of the Company's
common stock at the close of trading on April 5, 2022 was $10.19, Defendant Boehm
owned approximately $1.9 million worth of Company stock at that time.

13

36.    For the 2020 Fiscal Year, Defendant Boehm received $65,167 in total compensation from the Company, all of which was in fees earned or paid in cash. For the 2021 Fiscal Year, Defendant Boehm received $67,041 in total compensation from the Company. This included $52,500 in cash and $14,541 in stock options.

37.    The 2022 Proxy Statement stated the following about Defendant Boehm:

> **Rainer Boehm, M.D., MBA**, has served as a member of our Board since February 2018. Mr. Boehm has been a biopharmaceutical industry leader for more than three decades. At Novartis for 29 years, he held roles of increasing responsibility culminating with his position as Chief Commercial and Medical Affairs Officer and as ad interim CEO of Novartis' pharmaceuticals division. His background spans senior leadership, marketing, sales and medical affairs positions in both oncology and pharmaceuticals and he has led regions around the world, including North America, Asia and all emerging markets. Mr. Boehm has overseen the launch and commercialization of many new drugs in his career, including blockbuster breakthroughs Cosentyx and Entresto, and major oncology brands including Afinitor, Exjade, Tasigna, Femara, Zometa and Glivec. Mr. Boehm also currently serves on the board of directors for the following companies: Cellectis SA, a clinical-stage biopharmaceutical company focused on immunotherapies based on gene-edited CAR-T cells; Nordic Nanovector ASA, a clinical-stage biopharmaceutical company focused on targeted radiotherapies; BioCopy AG, a preclinical-stage company focused on copying of biomolecules; Berlin Cures AG, a clinical-stage biopharmaceutical company focused on the development of therapies against auto-antibodies. He graduated from the medical school at the University of Ulm in Germany and received his MBA from Schiller University at the Strasbourg campus in France. Mr. Boehm brings to the Board significant knowledge and experience within the biopharmaceutical industry, as well as financial acumen and operational experience.

**Defendant Barliant**

38.     Defendant Barliant has served as a Company director since January 2016. He is also a member of the Nominating and Corporate Governance Committee. According to the 2022 Proxy Statement, as of April 5, 2022, Defendant Barliant beneficially owned 308,745 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2022 was $10.19, Defendant Barliant owned approximately $3.1 million worth of Company stock at that time.

39.     For the 2020 Fiscal Year, Defendant Barliant received $56,500 in total compensation from the Company, all of which was in fees earned or paid in cash. For the 2021 Fiscal Year, Defendant Barliant received $59,831 in total compensation from the Company. This included $48,000 in cash and $11,831 in stock options.

40.     The 2022 Proxy Statement stated the following about Defendant Barliant:

> ***Ronald Barliant, JD***, has served as a member of our Board since January 2016. Mr. Barliant has been Of Counsel to Goldberg Kohn, Ltd. since January 2016, and immediately prior to that had served as a principal in Goldberg Kohn's Bankruptcy & Creditors' Rights Group since September 2002. He previously served as U.S. bankruptcy judge for the Northern District of Illinois from 1988 to 2002. Mr. Barliant has represented debtors and creditors in complex bankruptcy cases, and counseled major financial institutions, business firms and boards of directors in connection with workouts. Mr. Barliant brings to the Board valuable experience gained from a distinguished legal career as a counselor to numerous boards, considered judgment and financial sophistication.

**Defendant Buxton**

41.     Defendant Buxton has served as a Company director since December 2019. She is also the Chair of the Compensation Committee and is a member of the Audit Committee. According to the 2022 Proxy Statement, as of April 5, 2022, Defendant Buxton beneficially owned 117,268 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2022 was $10.19, Defendant Buxton owned approximately $1.2 million worth of Company stock at that time.

42.     For the 2020 Fiscal Year, Defendant Buxton received $54,156 in total compensation from the Company, all of which was in fees earned or paid in cash. For the 2021 Fiscal Year, Defendant Buxton received $65,196 in total compensation from the Company. This included $49,500 in cash and $15,696 in stock options.

43.     The 2022 Proxy Statement stated the following about Defendant Buxton:

> **Cheryl Buxton, MSc.**, has served as a member of our Board since December 2019. Until her retirement in December 2020, Ms. Buxton worked for over 25 years at Korn/Ferry International, the world's largest executive search company. Most recently, she served as the Korn Ferry Vice Chairman, Global Sector Leader, Pharmaceuticals, based in the Princeton office. Ms. Buxton conducted senior level assignments, with a special focus on research driven organizations. She also led the R&D sector for the Pharmaceutical and Consumer divisions within Korn Ferry. Ms. Buxton joined Korn Ferry's London office and European headquarters before spending time in Paris and then relocating to Princeton in 1997. Prior to joining Korn Ferry, Ms. Buxton was human resources director for Johnson & Johnson Pharmaceuticals

(Cala Ltd), based in the U.K., where her focus was on organizational issues and strategic resourcing and guidance on European directives. She also provided human resources support to three smaller companies in the group for Europe. Her human resources career started at Bristol Myers Ltd., where she was responsible for its consumer and pharmaceutical business. Ms. Buxton holds a master's degree in employment law and industrial relations from Leicester University, a degree in Nursing, a diploma in personnel management and is a member of the Institute of Personnel and Development. and the Advisory Board for South Asia Pharmaceutical Council. She previously was on the board of directors of SIFE. Ms. Buxton brings to the Board significant knowledge and experience within the biopharmaceutical industry, as well as leadership experience and an extensive executive network.

**Defendant Chappell**

44.    Defendant Chappell has served as a Company director since February 2021 and as the Company's CSO since July 2020. According to the 2022 Proxy Statement, as of April 5, 2022, Defendant Chappell beneficially owned 12,649,814 shares of the Company's common stock, or 18 percent of the total outstanding stock of the Company at that time. Given that the price per share of the Company's common stock at the close of trading on April 5, 2022 was $10.19, Defendant Chappell owned approximately $128.9 million worth of Company stock at that time.

45.    For the 2020 Fiscal Year, Defendant Chappell received $1,284,526 in total compensation. This included $200,341 in salary, $1,016,576 in option awards, and $67,609 in non-equity incentive plan compensation.

46.    During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed,

Defendant Chappell made the following sales of company stock at artificially inflated prices through Cheval Holdings, Ltd. and Black Horse Capital:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| June 2, 2021 | 76,126 | $19.01 | $1,447,155 |
| June 3, 2021 | 191,154 | $18.37 | $3,511,499 |
| June 4, 2021 | 127,084 | $18.46 | $2,345,971 |
| June 7, 2021 | 80,636 | $19.08 | $1,538,535 |
| June 16, 2021 | 158,486 | $19.43 | $3,079,383 |
| June 17, 2021 | 181,423 | $19.17 | $3,477,879 |
| June 18, 2021 | 402,480 | $18.50 | $7,445,880 |
| June 23, 2021 | 133,126 | $18.29 | $2,434,875 |
| June 24, 2021 | 139,529 | $18.38 | $2,564,543 |
| June 25, 2021 | 1,000,000 | $17.80 | $17,800,000 |
| June 30, 2021 | 219,256 | $17.28 | $3,788,744 |
| July 1, 2021 | 140,992 | $17.10 | $2,410,963 |
| July 2, 2021 | 102,848 | $17.12 | $1,760,758 |
| July 8, 2021 | 48,010 | $17.16 | $823,852 |
| July 9, 2021 | 296,036 | $17.37 | $5,142,145 |
| July 14, 2021 | 15,177 | $17.05 | $258,768 |
| July 21, 2021 | 132,764 | $17.14 | $2,275,575 |
| July 22, 2021 | 178,005 | $17.04 | $3,033,205 |
| July 23, 2021 | 5,584 | $17.04 | $95,151 |
| July 28, 2021 | 9,692 | $17.04 | $165,152 |
| July 29, 2021 | 29,394 | $17.03 | $500,580 |

| August 11, 2021 | 109,647 | $17.07 | $1,871,674 |
| August 12, 2021 | 57,551 | $17.16 | $987,575 |

Thus, in total, before the fraud was exposed, he sold 3,835,000 shares of Company common stock at artificially inflated prices on inside information, for which he received approximately $68,759,862. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

47.    The 2022 Proxy Statement stated the following about Defendant Chappell:

> **Dale Chappell, M.D., MBA**, has served as a member of our Board since February 2021. In addition, Dr. Chappell was appointed as our Chief Scientific Officer on July 6, 2020. Dr. Chappell is the managing member of Black Horse Capital Management LLC ("BH Management"), a private investment manager that specializes in biopharmaceuticals, a position he has held since 2002, and is the beneficial owner of a significant number of shares of our common stock. Since April 2015, Dr. Chappell has served as CEO, President and CFO of Cheval US Holdings, Inc., a private investment company with holdings in the hospitality industry. Previously, Dr. Chappell was an associate with Chilton Investment Company, covering healthcare, and an analyst at W.P. Carey & Company. Dr. Chappell, who received his MD from Dartmouth Medical School and his MBA from Harvard Business School, began his career as a Howard Hughes Medical Institute fellow at the National Cancer Institute where he studied tumor immunology, worked as a researcher in the labs of Dr. Steven A. Rosenberg and Dr. Nicholas P. Restifo and is published in the field of GM-CSF. Dr. Chappell previously served as a member of the Board from June 2016 to November 2017. Prior to joining the Company in a full-time role as our Chief Scientific Officer, Dr. Chappell advised and consulted with management as our ex-officio chief scientific officer. Dr. Chappell brings to the Board his extensive experience in the

19

biopharmaceuticals industry, provides our Board with unparalleled insight into the Company's development pipeline in his capacity as Chief Scientific Officer, as well as the perspective of a significant stockholder in the Company.

**Defendant Hohneker**

48.     Defendant Hohneker has served as a Company director since October 2021. He currently serves as a member of the Nominating and Corporate Governance Committee and the Compensation Committee. According to the 2022 Proxy Statement, as of April 5, 2022, Defendant Hohneker beneficially owned 7,110 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2022 was $10.19, Defendant Hohneker owned approximately $72,450 worth of Company stock at that time.

49.     For the 2021 Fiscal Year, Defendant Hohneker received $10,054 in total compensation from the Company. This included $10,054 in stock options.

50.     The 2022 Proxy Statement stated the following about Defendant Hohneker:

> ***John Hohneker, M.D.***, has served as a member of our Board since October 2021 and has over 30 years of drug development and leadership experience in the biopharmaceutical industry. Dr. Hohneker most recently served as President and CEO of Anokion SA, a Swiss biotechnology company, from January 2018 to January 2021. Prior to Anokion SA, he led Research and Development at Forma Therapeutics, a biotechnology company, from August 2015 to January 2018. Prior to Forma, Dr. Hohneker held various leadership roles during his 14 years at Novartis AG, from 2001 to 2015, where he last served as Senior Vice

President and Global Head of Development, Immunology and Dermatology. Prior to Novartis, he held several positions of increasing responsibility over a nearly 11-year period beginning at Burroughs Wellcome and then with its successor Glaxo Wellcome. Dr. Hohneker also currently serves on the board of directors for the following companies: Curis, Inc.(Nasdaq: CRIS), a publicly traded biotechnology company focused on the development and commercialization of innovative therapeutics for the treatment of cancer; BioTheryX, Inc., a private clinical-stage biopharmaceutical company focused on restoring protein homeostasis; Aravive, Inc. (Nasdaq: ARAV), a publicly traded biotechnology company focused on cancer treatments; Evelo Biosciences (Nasdaq: EVLO), a publicly traded clinical-stage biotechnology company developing orally delivered product candidates; Inzen Therapeutics, a private research stage biotechnology company, and Trishula Therapeutics, a private clinical-stage biotechnology company targeting cancer immunotherapy. He also served as a director of Dimension Therapeutics, Inc., which was a publicly traded biotechnology company, from January 2017 until it was acquired by Ultragenyx Pharmaceutical Inc. in October 2017. Dr. Hohneker received a bachelor's degree in chemistry from Gettysburg College and a medical degree from the University of Medicine and Dentistry of New Jersey at Rutgers Medical School. He completed his internship and residency in internal medicine and his fellowship in medical oncology, all at the University of North Carolina at Chapel Hill. In addition to his operational experience and expertise in the biopharmaceutical industry, Dr. Hohneker brings to the Board his direct experience leading business development and licensing deals, raising capital, and serving on corporate boards through acquisitions.

**Defendant Xie**

51.   Defendant Xie has served as a Company director since October 2021. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. According to the 2022 Proxy Statement, as of April 5, 2022, Defendant Xie beneficially owned 8,246 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of

trading on April 5, 2022 was $10.19, Defendant Xie owned approximately $84,026 worth of Company stock at that time.

52. For the 2021 Fiscal Year, Defendant Xie received $13,282 in total compensation from the Company. This included $13,282 in stock options.

53. The 2022 Proxy Statement stated the following about Defendant Xie:

**Kevin Xie, Ph.D.**, has served as a member of our Board since October 2021. Dr. Xie has nearly twenty years of experience evaluating and investing in companies across an array of healthcare-related industries, first for 13 years on the buy-side and then for six years in industry where he also demonstrated the ability to add value through operational improvements. He is currently the Chief Financial Officer of Gracell Biotechnologies Inc. (Nasdaq: GRCL), a global clinical-stage biopharmaceutical company dedicated to discovering and developing breakthrough cell therapies intended to disrupt conventional approaches to CAR-T cell therapies, a position he has held since July 2020. Prior to Gracell, Dr. Xie was the President of Healthcare Holdings for Fosun Group from March 2015 to July 2020, where he focused on investment projects in biotechnology, pharmaceutical, healthcare information technology, and healthcare services industries. Dr. Xie co-founded and served as Portfolio Manager of Locust Walk Capital from April 2010 to January 2012. Dr. Xie had previously served as Healthcare Sector Head at Scopia Capital, and as a Managing Director at Great Point Partners. He previously served on the Board of Directors for ViewRay, Inc. (Nasdaq: VRAY), a publicly traded medical device company that develops advanced radiation therapy technology for the treatment of cancer, from October 2019 to March 2022. In addition, from July 2020 to September 2021, Dr. Xie served on the Board of Directors of Alpha Healthcare Acquisition Corp., a publicly traded special purpose acquisition company, leading up to its business combination with Humacyte, Inc. Dr. Xie has a Bachelor of Science in Material Science and Engineering from Tianjin University, an MBA in Finance from The Wharton School of the University of Pennsylvania, and a PhD in Chemistry from The City University of New York. Dr. Xie brings to the Board his extensive experience in raising capital and serving on boards within the biopharmaceutical and

biotechnology industries.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

54.     By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the Company's business and corporate affairs, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

55.     Each director and officer owes the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

56.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

57.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

58.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of the Board at all relevant times.

59.     As the senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had

a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

60.     To discharge their duties, the Company's officers and directors were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the Company's officers and directors were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to the Company's own Code of Business Conduct (the "Code");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to

take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

26

61.     Each of the Individual Defendants further owed to the Company and the shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

62.     At all times relevant hereto, the Individual Defendants were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

63.     Because of their advisory, executive, managerial, directorial, and controlling positions with the Company, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

64.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

65.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true

27

facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

66.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

67.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of the Company was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

68.     Each of the Individual Defendants aided and abetted and rendered

substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of their overall contribution to and furtherance of the wrongdoing.

69.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

## COMPANY'S CODE OF BUSINESS CONDUCT AND CORPORATE GOVERNANCE

### *Humanigen's Code of Business Conduct*

70.     The Code, in its second section, titled, "Purpose," states that the Board adopted the Code in order to "deter wrongdoing and to promote":

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- Full, fair, accurate, timely and understandable disclosure in reports and documents that Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company;

- Compliance with applicable governmental laws, rules and regulations;

- The protection of Company assets, including corporate opportunities and confidential information;

29

- The prompt internal reporting to an appropriate person or persons identified in the Code of violations of the Code; and

- Accountability for adherence to the Code.

71.    Moreover, the Code states that "[i]t does not cover every issue that may arise, but it sets out basic principles to guide all directors, officers, employees and representatives of Humanigen, Inc. (the "Company"). All Company directors, officers, and employees must conduct themselves accordingly and seek to avoid even the appearance of improper behavior."

72.    With regard to conflicts of interest, the Code states that "[c]onflicts of interest are prohibited as a matter of Company policy[.]"

73.    With regard to "Compliance," the Code provides that "[w]e must all work to ensure prompt and consistent action against violations of the Code."

74.    Regarding "Public Disclosure of Information," the Code states as follows:

> The federal securities laws require the Company to disclose certain information in various reports that the Company must file with or submit to the SEC. In addition, from time to time, the Company makes other public communications, such as issuing press releases.

> The Company expects all directors, officers, employees and other personnel who are involved in the preparation of reports the Company files with the SEC reports, or other documents that are publicly disseminated, to ensure that the information disclosed in those documents is full, fair, accurate, timely and understandable.

> To the extent that you reasonably believe that questionable accounting

or auditing conduct or practices have occurred or are occurring, report those concerns to the Chief Executive Officer or Chief Financial Officer or in accordance with the Company's Whistleblower Policy or other procedures for addressing such concerns as may be adopted by the Audit Committee of the Board of Directors.

75.    The Code also provides that "[a]ll reports of known or suspected violations involving the accuracy of the Company's financial reports and related matters should be reported either directly to the Audit Committee[.]"

***Humanigen's Board of Directors Guidelines on Significant Corporate Governance Issues***

76.    Humanigen's Board of Directors Guidelines on Significant Corporate Issues (the "Board Guidelines") under section "Responsibilities of The Board of Directors" outlines the "primary responsibilities" of the Company's Board of Directors:

The primary responsibilities of the Board are oversight, counseling and direction to the management of the Company in the interest and for the benefit of the Company's stockholders. The Board's responsibilities include the matters identified below:

(a) Selecting, regularly evaluating the performance of, and approving the compensation of the Chief Executive Officer and other senior executives;

(b) Planning for succession with respect to the position of Chief Executive Officer and monitoring management's succession planning for other senior executive roles;

(c) Reviewing and, where appropriate, approving the Company's major financial objectives, strategic and operating plans and actions;

31

(d) Overseeing the conduct of the Company's business to evaluate whether the business is being properly managed;

(e) Overseeing the processes for maintaining the integrity of the Company with regards to its financial statements and other public disclosures, and compliance with law and ethics; and

(f) Monitoring the effectiveness of the governance practices under which the Board operates and make changes as needed.

77.     Under "Corporate Business Principles," the Board Guidelines establish requirements for conduct and ethical behavior of the Company's Board members:

> Members of the Board must act at all times in accordance with the requirements of the Company's Code of Business Conduct, which is applicable to each director. This obligation at all times includes, without limitation, adherence to the Company's policies with respect to conflicts of interest, confidentiality, protection of the Company's assets, ethical conduct in business dealings and respect for and compliance with applicable law. Any waiver of the requirements of the Code of Business Conduct with respect to any individual director will be reported to, and be subject to the approval of, the Board.

### *Humanigen's Audit Committee Charter*

78.     Humanigen's Audit Committee Charter states that one of the Audit Committee's purposes is to "assist the Board in fulfilling its oversight responsibilities relating to the Company's accounting and financial reporting and disclosure processes and the audit of the Company's financial statements."

79.     The Audit Committee Charter also describes the Audit Committee's specific responsibilities "to serve as an independent and objective monitor" of:

- The quality and integrity of the Company's financial statements, accounting principles, reporting and related disclosures;

- The effectiveness of the Company's disclosure controls and procedures and internal controls over financial reporting;

- The Company's compliance with legal and regulatory requirements and internal policies regarding ethical conduct; and

- The qualifications, independence and performance of the Company's independent registered public accounting firm (the "independent auditors").

80.     The Audit Committee Charter further enumerated certain "responsibilities and authority" of the Audit Committee, including, *inter alia*, the following:

- Reviewing periodically, with the Company's management and independent auditors, the Company's financial reporting processes and disclosure controls and procedures, including the Company's policies and procedures designed to assure that information required to be disclosed in its periodic public reports is accurately reported within the time periods specified by the SEC;

- Reviewing periodically, with the Company's management and independent auditors, the adequacy and effectiveness of the Company's internal controls over financial reporting designed to protect assets and provide assurance that transactions are properly authorized, executed, recorded and summarized in the Company's books of record. As part of this responsibility, the Committee will meet with management at least annually to review its plan for the maintenance, modification, enhancement and testing of such controls for the ensuing fiscal year;

- Reviewing the reports prepared by management, and (if required by SEC rules) attested to by the Company's independent auditors, assessing the adequacy and effectiveness of the Company's internal controls over financial reporting, prior to the

33

inclusion of such reports in the Company's periodic filings as required under the rules of the SEC. If applicable, the Committee's review will focus on any significant deficiencies in, any significant changes to, or material weaknesses in such controls reported by the independent auditors, or comments and management's responses contained in any accompanying management letter;

*      *      *

- Directing the independent auditors to review, before filing with the SEC, the Company's interim financial statements included in quarterly reports on Form 10-Q, using professional standards and procedures for conducting such reviews;

81.   The Audit Committee Charter further provides that the Audit Committee is tasked with oversight of controls and procedures as follows: "Reviewing, approving and monitoring the Code of Business Conduct for the Company in accordance with the applicable rules of Nasdaq and the SEC, including any waivers of the Code of Business Conduct for any directors and officers."

82.   The Individual Defendants violated the Code, Company policy, and the Company's corporate governance documents by engaging in or permitting the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and failing to report the same. Further in violation of the Code, the Board Guidelines, and the Company's policies, the Individual

34

Defendants failed to maintain internal controls, failed to maintain the accuracy of Company records and reports, and failed to comply with applicable laws and regulations.

83.     In violation of Humanigen's Audit Committee Charter, Defendants Xie (as Chair), Buxton, and Boehm (the "Audit Committee Defendants") conducted little, if any, oversight of Humanigen's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of Humanigen's Audit Committee Charter, the Audit Committee Defendants failed to adequately oversee major issues regarding the Company's accounting principles and financial statement presentations and major issues related to the adequacy of the Company's internal controls, including the Company's internal control over financial reporting and disclosure controls and procedures.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Background*

84.     Humanigen previously operated by the name KaloBios Pharmaceuticals, Inc. and was helmed by disgraced securities fraud convict Martin

"Pharma Bro" Shkreli. After Shkreli was arrested in December 2015, the Company declared bankruptcy, restructured, and subsequently renamed itself to Humanigen in August 2017.

85.     Post restructuring, Humanigen is a Delaware corporation based in Short Hills, New Jersey that seeks to research, develop, and manufacture a portfolio of anti-inflammatory and immune-oncology monoclonal antibodies drugs. Humanigen mainly focuses on developing human antibodies for therapeutic use for patients with acute and chronic conditions such as cancer.

86.     During the Relevant Period, Humanigen's lead drug candidate was LENZ, a monoclonal antibody.[2] The Company purports that LENZ offers advantages over other competitors due to LENZ's high potency, slow-off rate, and lower likelihood of inducing an inappropriate immune response or infusion related reactions.

87.     Before the COVID-19 pandemic, the Company depicted LENZ as a new monoclonal antibody that had the "potential to both improve the efficacy and

---

[2] According to the Mayo Clinic, "monoclonal antibodies are laboratory-produced molecules engineered to serve as substitute antibodies that can restore, enhance, modify, or mimic the immune system's attack on cells that aren't wanted, such as cancer cells." https://www.mayoclinic.org/diseases-conditions/cancer/in-depth/monoclonal-antibody/art-20047808#:~:text=Monoclonal%20antibodies%20are%20laboratory%2Dproduced,wanted%2C%20such%20as%20cancer%20cells.

safety associated with CAR-T therapy[3]." Humanigen maintained that preclinical data from the Mayo Clinic indicated that LENZ could block cytokine storm, or CRS, from occurring. CRS is an acute systemic inflammatory syndrome caused by the body's immune system overreacting to infection, and in result, suddenly discharging large quantities of inflammatory inducing signaling molecules called cytokines. CRS can produce life-threatening symptoms such as fever, reduced heart function, multiple organ dysfunction, and in some instances, total organ failure.

88.   According to Humanigen, LENZ blocked CRS from occurring by targeting GN-CSF, which is a type of cytokine called granulocyte-macrophage colony-stimulating factor.

89.   Humanigen attempted to test LENZ through clinical trials in an effort for LENZ to be used as part of CAR-T therapy. The Company "aim[ed] to position lenzilumab as a 'must have' companion product to any CART-T therapy and an essential part of the standard pre-conditioning that all patients administered CAR-T must receive."

---

[3] According to the American Cancer Society, CAR-T therapy is an abbreviation for Chimeric antigen receptor (CAR) T-cell therapy. CAR-T therapy "is a way to get immune cells called T cells (a type of white blood cell) to fight cancer by changing them in the lab so they can find and destroy cancer cells. CAR T-cell therapy is also sometimes talked about as a type of cellbased gene therapy, because it involves altering the genes inside T cells to help them attack the cancer." https://www.cancer.org/treatment/treatments-and-side-effects/treatment-types/immunotherapy/car-t-cell1.html.

90.     Throughout 2019 and extending into the first quarter of 2020, the Company worked with Kite Pharmaceuticals, Inc., a company owned by Gilead Sciences, Inc., to evaluate LENZ's effect on Kite Pharamceuticals' Yescarta treatment, which is an FDA-approved CAR-T therapy. To assess LENZ's capabilities, Humanigen desired to conduct multi-center studies to track LENZ's effect on preventing CRS with a secondary endpoint of increased efficacy of Yescarta.

91.     At that time, despite Humanigen declaring that the "CAR-T market" was growing, there were only two FDA approved CAR-T therapies in 2019, one of which was Yescarta. Additionally, both of the available CAR-T therapies had "black box warnings" for CRS and neurologic toxicities. The FDA requires "black box warnings" to alert patients about severe safety risks. In result of this precarious situation, CAR-T therapies were rarely used; further, LENZ's upside potential was therefore quite restrained.

92.     Consequently, by December 31, 2019, Humanigen harbored "substantial doubt[s] about [its] ability to continue as a going concern," partly because of its ballooning $285 million deficit and projected future net losses. As of December 31, 2019, the Company's cash and cash equivalents hovered around $100,000.

93.     The Company's financial survival, at that point in time, was largely

because of Defendant Chappell and Black Horse Entities. By February 2018, Defendant Chappell and Black Horse Entities had furnished about $18.4 million to the Company via multiple credit and loan agreements. However, in lieu of paying back Defendant Chappell, the Company issued him and Black Horse Entities more than 66.8 million shares of common stock, making Defendant Chappell, through his ownership of Black Horse Entities, Humanigen's controlling shareholder with approximately 62.6% of the Company's voting power.

### *Onset of the COVID-19 Pandemic*

94.     By March 2020, the COVID-19 virus had largely enveloped the world and caused great disruption and suffering throughout everyday life. However, the Individual Defendants saw opportunity in the COVID-19 pandemic to prop up the Company's dwindling business model.

95.     Right after the United States declared a national emergency for COVID-19 in early March 2020, the Company started telling investors that LENZ could be reworked as a COVID-19 treatment for patients suffering from severe lung dysfunction. Humanigen stated that COVID-19 patients were succumbing to lung dysfunction triggered by CRS. The Company maintained that these COVID-19 patients had high levels of GM-CSF, which LENZ was created to treat in CAR-T therapy treatment.

96.     Smelling opportunity, the Company abruptly shifted its business model

to hail LENZ as a possible treatment for CRS in COVID-19 patients. Humanigen announced this shift in business model without evidence to show that higher GM-CSF levels actually caused CRS in COVID-19 patients. The Company validated its position by claiming "[r]ecent data from China" and an unpublished and unsubstantiated academic paper supported Humanigen's characterization of LENZ.

97.    However, and inapposite to Humanigen's SEC filings during this time, GM-CSF is integral to improving respiratory disease patients' lung function, including COVID-19 patient health.

98.    GM-CSF is necessary for healthy alveoli in the lungs. Alveoli are the small sacs inside the lungs that exchange oxygen for carbon dioxide in the blood. Therefore, alveoli are vital to the healthy operation of the respiratory system. GM-CSF works to maintain the alveolar epithelium and pulmonary immune system, ensuring that homeostasis is maintained when the body is under attack from infectious diseases. In other words, the healthy body manufactures GM-CSF so that the lungs' alveoli can recover quickly from infectious diseases. On the other hand, if the body does not manufacture enough GM-CSF when the body is under attack, the body's recovery from infectious disease can be more difficult and damage a patient's health further.

99.    Many studies have proven the benefits of treating the body with GM-CSF, in contrast to Humanigen's position of preventing GM-CSF production, when

treating respiratory system issues. These studies, both before and after the Relevant

Period, show the benefits of GM-CSF in lung function:

- In mice, GM-CSF has prevented lung damage by strengthening alveolar cells and guarded against bacterial infections[4];

- Presence of GM-CSF in acute lung injury patients relates to higher survival rates[5];

- GM-CSF's presence in the lungs has shown to be beneficial in the body's fight against bacterial pneumonia by spurring repair of lung tissue and triggering immune responses to clear pathogens[6];

- Mice treated with GM-CSF fought off deadly influenza in the lungs[7];

- Presence of GM-CSF in mice after viral influenza infection increased survival rates[8];

---

[4] GM-CSF and the Impaired Pulmonary Innate Immune Response Following Hyperoxic Stress, Am. J. Physiol. Lung Cell Mol. Physiol, 2006; Paine R, III, et al.
[5] Matute-Bello, et al. Crit. Care Med. 2000.
[6] Rosler B, et ano., Lung epithelial GM-CSF improves host defense function and epithelial repair in influenza virus pneumonia-a new therapeutic strategy? Mol. Cell Pediatr. 2016; Standiford LR, et al. TLR4-dependent GM-CSF protects against lung injury in Gram-negative bacterial pneumonia. Am. J. Physiol. Lung Cell Mol. Physiol. 2012; Unkel B, et al. Alveolar epithelial cells orchestrate DC function in murine viral pneumonia. J. Clin. Invest. 2012; Sever-Chroneos Z, et al. GM-CSF modulates pulmonary resistance to influenza A infection. Antivir. Res. 2011; Steinwede K, et al. Local delivery of GM-CSF protects mice from lethal pneumococcal pneumonia. J. Immunol. 2011.
[7] Subramaniam R, Hillberry Z, Chen H, Feng Y, Fletcher K, Neuenschwander P, Shams H. Delivery of GM-CSF to Protect against Influenza Pneumonia. PLoS One. 2015 Apr 29;10(4):e0124593. doi: 10.1371/journal.pone.0124593. PMID: 25923215; PMCID: PMC4414562.
[8] Halstead, E.S., Umstead, T.M., Davies, M.L. *et al.* GM-CSF overexpression after influenza a virus infection prevents mortality and moderates M1-like airway monocyte/macrophage polarization. *Respir Res* 19, 3 (2018). https://doi.org/10.1186/s12931-017-0708-5.

- Mice suffering from lack of GM-CSF showed lower survival rates because of debilitated alveolar function[9];

- GM-CSF administration to hospitalized COVID-19 patients experiencing respiratory failure led to better oxygenation after five days of treatment compared to standard of care treatment. Top-line data revealed that the GM-CSF treatment was well received and did not cause any cytokine storm episodes[10].

100.  These studies collectively demonstrate that GM-CSF has a crucial function for maintaining lung health. Nevertheless, in May 2020, Humanigen began trials centered on treating hospitalized COVID-19 patients with LENZ, a drug that inhibits GM-CSF production.

101.  Moreover, on June 30, 2020, the FDA published guidance on the requirements necessary to support approval of novel COVID-19 treatments, titled *Development and Licensure of Vaccines to Prevent COVID-19* (the "FDA Publication"). The FDA Publication's goal was to "provide an overview of key considerations to satisfy regulatory requirements" in developing COVID-19 treatments.

102.  The FDA Publication stated that, in respect to clinical trials and trial

---

[9] Ballinger MN, Paine R 3rd, Serezani CH, Aronoff DM, Choi ES, Standiford TJ, Toews GB, Moore BB. Role of granulocyte macrophage colony-stimulating factor during gram-negative lung infection with Pseudomonas aeruginosa. Am J Respir Cell Mol Biol. 2006 Jun;34(6):766-74. doi: 10.1165/rcmb.2005-0246OC. Epub 2006 Feb 10. PMID: 16474098; PMCID: PMC2644237.

[10] Partner Therapeutics, SARPAC Clinical Trial of Leukine® (sargramostim, rhu GM-CSF) in Hospitalized COVID-19 Patients Meets Primary Endpoint of Significant Improvement in Lung Function (Feb. 26, 2021).

population size, "[s]ponsors should collect and evaluate at least preliminary clinical safety and immunogenicity data for each dose level and age group (e.g., younger versus older adults) to support progression of clinical development to include larger numbers (e.g., **hundreds**) of participants and participants at higher risk of severe COVID-19" (emphasis added).

103.   Additionally, the FDA publication forewarned that "[t]o generate sufficient data to meet the BLA approval standard, late phase clinical trials to demonstrate vaccine efficacy with formal hypothesis testing **will likely need to enroll many thousands of participants**, including many with medical comorbidities for trials seeking to assess protection against severe COVID-19" and that "[i]nitiation of late phase trials should be preceded by adequate characterization of safety and immunogenicity (e.g., **in a few hundred participants for each vaccine candidate, dose level, and age group to be evaluated**) to support general safety, potential for vaccine efficacy, and low risk of vaccine-associated ERD" (emphasis added).

104.   The Individual Defendants were aware of and had reviewed the FDA Publication, as the Company referenced the FDA Publication multiple times throughout its 2020 and 2021 SEC filings. However, despite the awareness and consideration of the FDA Publication, Humanigen did not present enough trial participants in its LIVE-AIR Study to meet the FDA's requirements. Indeed, by

October 2, 2020, when the Company met with the FDA for its first Type B meeting, it had enrolled less than 300 patients in the LIVE-AIR Study, which was inconsistent with the FDA Publication's guidance issued in June 2020.

### *LIVE-AIR Study*

105.   United States law requires all drug companies to receive FDA approval before releasing a new drug to the public. To receive FDA approval, a drug company must generally prove that a drug is safe to use, effective in its purpose, and that the benefits the drug provides outweigh the risks it creates. Usually, the FDA approval process begins with the testing of drugs in clinical trials and ends in the submission of a New Drug Application ("NDA") or BLA.

106.   NDAs and BLAs normally consist of statistics and other data that the FDA uses to evaluate the drug's safety, purported benefits, efficacy, appropriate labeling, and manufacturing processes, among other things.

107.   To obtain enough data to satisfy the FDA's standards, drug companies subject their drug candidates to multiple rounds, or phases, of clinical trials. Phase 1 clinical trials usually assess a drug candidate's safety and dosage. Phase 2 clinical trials usually employ larger groups of patients, assess dosage, identify safety risks and detrimental effects, and determine an early efficacy rate for the drug's intended use. Lastly, Phase 3 clinical trials often deploy placebos to assess holistic risk and benefits, in addition to help the FDA determine appropriate labeling for the drug.

44

108.   However, under exigent circumstances, such as during a global pandemic, the traditional drug approval process can be bypassed by obtaining an Emergency Use Authorization ("EUA"). The FDA's standard for granting an EUA is whether, based upon the totality of the scientific evidence available, it is reasonable to conclude that the drug candidate may be effective and that potential benefits outweigh the potential risks.

109.   To this end, before the Relevant Period, on April 15, 2020, Humanigen announced in a press release that the Company planned to bypass the normal clinical approval and planned to initiate a Phase 3 trial. The Company stated it would enroll patients in the LIVE-AIR Study, a multicenter, randomized, placebo-controlled, double-blind clinical trial of LENZ with the goal of preventing respiratory failure in hospitalized COVID-19 patients.

110.   Shortly thereafter, on May 6, 2020, Humanigen announced in a press release that a patient had received the first dose of LENZ in the LIVE-AIR Study. In the press release, Defendant Durrant stated, in relevant part:

> We are working with some of the top centers and clinicians in the US, alongside our contract research organization partner, CTI, to advance lenzilumab through Phase III with the intent to prevent serious and potentially fatal outcomes in high risk patients who are hospitalized with COVID-19… ***As the only company working on prevention of cytokine storm through GM-CSF neutralization for nearly three years***, we have multiple accepted publications in this field, substantial safety data, including in patients with severe respiratory disease, and have filed extensive IP. We are grateful to FDA, CTI, other partners and our extensive network of recruitment centers in their support to

enable recruitment of patients into this study as quickly as possible.

(Emphasis added.)

111.  The LIVE-AIR Study employed patients with severe COVID-19 symptoms. Under the parameters of the LIVE-AIR Study, the enrolled patients would receive three intravenous 600mg doses of LENZ or placebo eight hours apart. The primary endpoint was survival without ventilation.

112.  The Company planned to use the data from the LIVE-AIR Study as the only support for its LENZ EUA submission.

### ACTIV-5/BET-B Study

113.  On July 24, 2020, while the LIVE-AIR Study was in progress, the Company penned a clinical trial agreement with the National Institute of Allergy and Infectious Diseases ("NIAD"), an agency of the National Institute of Health. Per the agreement, NIAD consented to evaluating LENZ's performance in hospitalized COVID-19 patients as part of its ACTIV-5/BET-B Study.

114.  The ACTIV-5/BET-B Study was designed to identify possible treatments for COVID-19 patients and fast-track promising treatments for use in bigger clinical trials. The ACTIV-5/BET-B Study looked to enroll patients in 40 testing centers across the United States and test LENZ along with other COVID-19 treatments, including remdesivir, against varying levels of care. LENZ would be administered to about 100 hospitalized COVID-19 patients with remdesivir and then

compared to a 100-person placebo group who would receive placebo and remdesivir.

### September 2020 Public Offering

115.   On August 5, 2020, after the market closed, Humanigen filed a prospectus pertaining to the registration and/or resale of 82,563,584 shares of the Company's common stock for listing on the NASDAQ.

116.   Shortly thereafter, on September 22, 2020, the Company announced in a press release that it had completed its underwritten public offering of common stock. The Company raised proceeds of approximately $72.8 million from the sale of 9,200,000 shares in the offering. The press release further stated that the Company "intends to use the net proceeds from the offering to support its manufacturing, production, and commercial preparation activities relating to [LENZ] as a potential therapy for COVID-19 patients…"

### Humanigen Meets with the FDA

117.   On October 2, 2020, the Company announced in a press release that it held a Type B meeting with the FDA. Type B meetings are landmark meetings between the FDA and drug candidate companies wherein the progress of the drug candidate is discussed, like LENZ.

118.   Regarding LENZ, the press release stated that the "FDA agreed that the Company's intended submission may be sufficient to support an EUA request, subject to Phase 3 [LIVE-AIR] trial data, and provided guidance and support for the

Company's Biologics License Application approval pathway."

119.   The press release also featured a statement from Defendant Durrant saying that the "FDA was very helpful and provided clear guidance on our EUA submission plan. . .. We are encouraged by our Type B meeting and remain confident in our program and preparedness plan in advance of a potential EUA."

### LIVE-AIR Study Data Announcement

120.   On November 6, 2020, the Company published encouraging data in a press release from the LIVE-AIR Study. Specifically, Humanigen stated "the interim analysis for sizing and powering suggested that Lenzilumab had a clinically meaningful impact on patient recovery, with an estimated 37 percent more recoveries observed in the lenzilumab arm of the randomized, placebo-controlled, double-blinded study versus current standard of care (SOC)."

121.   In the same release, Humanigen revealed that it would increase the size of the LIVE-AIR Study from 300 to 515 patients to preserve ninety percent power per the Data and Safety Monitoring Board ("DSMB"). The press release stated that DSMB "conducted an interim analysis of the unblinded data for trial sizing and powering and recommended increasing the target number of events (recoveries) . . . to maintain the power of the study at 90 percent. The adaptive trial design only allows for the addition of patients if interim data are in the 'promising zone' (i.e., achieving or surpassing an average improvement in recoveries of 29 percent (hazard

ratio (HR) ≥ 1.29 through day 28).”

122.   The Company also stated that, “[a]t the recommendation of the DSMB, the company plans to increase enrollment to achieve 402 events (approximately 515 patients). This increase in enrollment ensures an even higher probability of success in meeting the primary endpoint and maintains the power of the study at 90 percent.”

123.   Humanigen further said that it planned “to file for EUA in the first quarter of 2021 either following interim data at 75 percent or at study completion. The Phase 3 trial . . . is enrolling at sites across the U.S. and Latin America. Current enrollment stands at 300.”

124.   A little over a month later, on December 31, 2020, the Company announced an “update” on the LIVE-AIR Study. The update stated that another “interim analysis for safety” was conducted by DSMB. Based upon the results of the analysis and “feedback from FDA regulators regarding the amount of patient data that would be required to support [a BLA],” the Company “decided not to conduct an interim analysis for efficacy.”

### *March 2021 LIVE-AIR Study Results*

125.   On March 29, 2021, Humanigen released results from the LIVE-AIR Study. In relevant part, the Company stated that the “[t]rial results showed that patients who received lenzilumab and other treatments, including steroids and/or remdesivir, had a 54% greater relative likelihood of survival without the need for

IMV [invasive mechanical ventilation] compared with patients receiving placebo and other treatments. These results are statistically significant."

126.   The results also revealed that the LIVE-AIR Study's secondary endpoint of survival (in contrast to ventilator-free survival) was not "statistically significant."

127.   Defendant Durrant was quoted in the Company's announcement, stating that ""Our next step is to submit an application for Emergency Use Authorization (EUA) to the Food and Drug Administration (FDA) as soon as possible."

### Humanigen Submits the LENZ EUA to the FDA

128.   On May 28, 2021, before the market opened, Humanigen announced in a press release that the Company submitted the LENZ EUA to the FDA. The press release stated that "[t]his EUA application follows positive results from the LIVE-AIR Phase 3 clinical trial evaluating the ability of lenzilumab to improve the likelihood of survival without ventilation (SWOV) in newly hospitalized COVID-19 patients."

129.   Approximately two months later, on July 30, 2021, Humanigen announced in a press release that the NIAID advanced the ACTIV-5/BET-B Study to a Phase 2/3 study.

130.   On September 9, 2021, before the market opened, Humanigen revealed

50

in a press release that the FDA rejected the LENZ EUA, in relevant part:

> [T]he U.S. FDA has declined its request for emergency use authorization of lenzilumab to treat newly hospitalized COVID-19 patients. In its letter, FDA stated that it was unable to conclude that the known and potential benefits of lenzilumab outweigh the known and potential risks of its use as a treatment for COVID-19.

131. In breach of their fiduciary duties to the Company, the Individual Defendants placed their own interests over the interests of Company shareholders, by misleading investors and the general public about the efficacy and general abilities of LENZ, thereby causing the Company's stock to trade at artificially inflated prices throughout the Relevant Period.

132. During the Relevant Period, the Individual Defendants caused the Company to make material false and misleading statements and failed to disclose that: (1) certain of the Company's financial statements were false and unreliable; (2) LENZ's efficacy in treating hospitalized COVID-19 was overstated and the ACTIV-5/BET-B Study would not meet its primary endpoint; (3) additionally, the LIVE-AIR Study did not give Humanigen enough patient safety data to support approval of the LENZ EUA; (4) as a result, it was extremely unlikely the FDA would approve the LENZ EUA; (5) a large amount of both medical and academic data already stated that GM-CSF was integral to proper lung function, contrary to the Company's "hypothesis" from "pre-publication papers" that reducing GM-CSF would help COVID-19 patients; (6) LENZ was not the only purported treatment undergoing

51

clinical studies during the Relevant Period; and (7) the Company failed to maintain adequate internal controls. As a result, the 2021 Proxy Statement was materially false and misleading.

## **False and Misleading Statements Made During the Relevant Period**

### *May 15, 2020 Form 10-Q*

133.   On May 15, 2020, after the market closed, the Company filed its quarterly report on From 10-Q with the SEC for the period ended March 31, 2020 (the "1Q20 10-Q"). The 1Q20 10-Q was signed by Defendant Durrant, and contained certifications, signed by Defendant Durrant, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements contained in the 1Q20 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

134.   The 1Q20 10-Q stated the following, in relevant part:

> The recent coronavirus pandemic, which is due to the SARS-CoV-2 virus and leads to the condition referred to as COVID-19, is frequently characterized in the later and sometimes fatal stages by severe, progressive viral pneumonia that can progress to acute respiratory distress syndrome ("ARDS"), respiratory failure and death. Recent publications indicate that ARDS in this setting is caused by the body's autoimmune response to CRS. Published data point to GM-CSF being a key triggering cytokine, with elevated levels especially in those patients who transition to the Intensive Care Unit ("ICU"). In response to this published data indicating that GM-CSF inhibition may play a role in treating patients with COVID-19, **the Company is developing lenzilumab in COVID-19 in a Phase III potential registration study**.

52

> The Company has commenced enrollment in a multicenter randomized, placebo-controlled, double-blind clinical trial with lenzilumab for the prevention of respiratory failure and/or death in hospitalized patients with severe pneumonia associated with SARSCoV-2 infection (Clinicaltrials.gov # NCT04351152).

(Emphasis added.)

135.   The 1Q20 10-Q also told investors the following about the unpublished article and "recent data from China":

> **Recent data from China and the subject of a pre-publication titled "Aberrant pathogenic GM-CSF+ T cells and inflammatory CD14+CD16+ monocytes in severe pulmonary syndrome patients of a new coronavirus", supports the hypothesis that cytokine storm-induced immune mechanisms have contributed to patient mortality with the current pandemic strain of coronavirus.**

(Emphasis added.)

### *August 5, 2020 Prospectus*

136.   On August 5, 2020, the Company filed a prospectus on Form 424B4 (the "August 2020 Prospectus") with the SEC relating to the resale and/or registration of 82,563,584 shares of Company common stock for listing on the NASDAQ. When the Prospectus was filed, Humanigen's common stock traded for $4.95 per share on the OTCQB. Defendant Durrant signed the registration statement issued in connection with the Prospectus. The Prospectus stated the following GM-CSF, LENZ, and COVID-19, in relevant part:

> **We believe that, as an upstream regulator of cytokine storm, GM-CSF neutralization with lenzilumab may offer advantages over other immunomodulator strategies** that either target other

downstream cytokines such as IL-1, IL-6, CCR5 or MIP-1 alpha or are broadly immunosuppressive and target cytokine signaling pathways nonselectively through JAK inhibition. In addition, **lenzilumab is the only immunomodulator that was in an active clinical trial in another indication to prevent cytokine storm prior to embarking upon the Phase III COVID-19 trial and is currently the only agent in an active Phase III trial targeting GM-CSF.**

***

**As an upstream regulator of cytokine storm, GM-CSF neutralization with lenzilumab may offer advantages over other immunomodulator strategies** that either target other downstream cytokines such as IL-1, IL-6, CCR5 or MIP-1 alpha or are broadly immunosuppressive and target cytokine signaling pathways non-selectively through JAK inhibition. In addition, **lenzilumab is the only immunomodulator that was in an active clinical trial to prevent cytokine storm prior to COVID-19 and is currently the only agent in an active Phase III trial targeting GM-CSF.**

(Emphasis added.)

### *August 10, 2020 BTIG Virtual Biotechnology Conference*

137.   On August 10, 2020, Defendants Durrant and Chappell represented Humanigen at the BTIG Virtual Biotechnology Conference. During the conference, the Company presented the following slide:

54



***August 14, 2020 Form 10-Q***

138.  On August 14, 2020, the Company filed its quarterly report with the SEC for the period ended June 30, 2020 (the "2Q20 10-Q"). The 2Q20 10-Q was signed by Defendant Durrant, and contained SOX certifications, signed by Defendants Durrant, attesting to the accuracy of the financial statements contained in the 2Q20 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

139.  The 2Q20 10-Q stated the following about the role of GM-CSF inhibition in COVID-19 treatment:

The coronavirus pandemic, which is due to the SARS-CoV-2 virus and leads to the condition referred to as COVID-19, is frequently characterized in the later and sometimes fatal stages by severe and critical, progressive viral pneumonia that can progress to acute respiratory distress syndrome ("ARDS"), respiratory failure and death. Publications have indicated that ARDS in this setting is caused by the body's autoimmune response to CRS. Published data point to GM-CSF being a key triggering cytokine, with elevated levels especially in those patients who transition to the Intensive Care Unit ("ICU").

**In response to this published data indicating that GM-CSF inhibition may play a role in treating patients with COVID-19, the Company is developing lenzilumab in patients with COVID-19 in a Phase III study**. Given the severity of the pandemic and the lack of approved therapies for COVID-19, **the Company believes that this single Phase III study may be suitable for registration and depending on the results of this study may file for approval with the FDA**. The Company has commenced enrollment in a multicenter randomized, placebo-controlled, double-blind clinical trial to assess whether lenzilumab can reduce the time to recovery in hospitalized subjects with severe or critical COVID-19 pneumonia. The first patient was dosed with lenzilumab on May 5, 2020.

(Emphasis added.)

### September 18, 2020 Prospectus

140.   On September 18, 2020, after the market closed, the Company filed a prospectus pursuant to Rule 424(b)(5) (the "September 2020 Prospectus") that announced a public offering of 8 million shares of Company common stock. Defendant Durrant signed the accompanying registration statement pursuant to the September 2020 Prospectus.

141.   The September 2020 Prospectus stated the following about achieving the LENZ EUA:

We believe that, as an upstream regulator of cytokine storm, **GM-CSF neutralization with lenzilumab may offer advantages over other immunomodulator strategies** that either target other downstream cytokines such as IL-1, IL-6, CCR5, MCP-1, IP-10, TNF-α, or MIP-1α (the ligand for the CCR5 receptor) or are broadly immune-suppressive and target cytokine signaling pathways non-selectively through JAK inhibition or steroids which have well documented lympholytic properties. In addition, we believe, **lenzilumab is the only immunomodulator that was in an active clinical trial in a non-COVID indication to prevent cytokine storm prior to embarking upon the Phase III COVID-19 trial. According to clintrials, lenzilumab is currently the only agent in an active Phase III trial targeting GM-CSF**. In addition, lenzilumab may have additional benefits on T-cell function as demonstrated in preclinical models with CAR-T.

***

We are currently enrolling patients in a Phase III multi-center, randomized, placebo-controlled, double-blinded, clinical trial in the setting of COVID-19. **The Phase III trial will assess the safety and efficacy of lenzilumab in improving time to recovery and reducing severe outcomes in hospitalized adult patients with confirmed severe or critical COVID-19 pneumonia and may serve as the basis for EUA and/or submission of a Biologics License Application ("BLA") for approval of lenzilumab for COVID-19 pneumonia**. The first patient was dosed in May 2020. There are currently 17 clinical sites across the US and we are targeting 12 clinical sites in Brazil.

(Emphasis added.)

### *November 6, 2020 Press Release*

142.   On November 6, 2020, before the market opened, Humanigen announced in a press release "positive interim Phase 3 data" from the LIVE-AIR Study. The press release contained a statement from Defendant Chappell, stating, "we believe the Phase 3 trial is **significantly de-risked**" and that the Company will

add more patients to the LIVE-AIR Study which "**further supports our plans for Emergency Use Authorization (EUA)** and Biologics License Application (BLA) submission" (emphasis added).

### *January 13, 2021 JP Morgan Healthcare Conference*

143.   On January 13, 2021, Defendants Durrant and Chappell represented Humanigen at the JP Morgan Healthcare Conference. During the conference, the Company presented the following slides:





*May 28, 2021 Press Release*

144.   When presenting the slides, Defendant Durrant stated the following, in

relevant part:

> So on to Slide 4, lenz overview. Lenz is our anti-human GM-CSF
> monoclonal antibody. This is a very different monoclonal antibody and
> a very different mechanism of action from the neutralizing monoclonal
> antibodies that -- being used in the outpatient setting for COVID as a
> prevention for hospitalization. Those neutralizing antibodies target the
> virus, fight protein, and they try and prevent the virus from entering and
> infecting cells.
>
> ***
>
> So some important unique aspects of lenz, you can see in the middle of
> this slide here. Lenz has a dual mechanism of action in helping
> replenish T cells and dampening the hyperinflammation. The full
> course of lenz can be administered to hospitalized hypoxic patients in a
> single day. And lenz doesn't have any renal or hepatic impairment
> limitations. So it can be used in combination with other therapies, and
> we've seen no serious adverse events in hundreds of patients in multiple
> different clinical settings. **So there's been an excellent safety and
> tolerability profile to date.**

(Emphasis added.)

### March 10, 2021 Form 10-K

145.  On March 10, 2021, the Company filed its annual report for the 2020 Fiscal Year on Form 10-K with the SEC (the "2020 10-K"). The 2020 10-K was signed by Defendants Durrant, Barliant, Boehm, Buxton, and Chappell and contained SOX certifications, signed by Defendants Durrant, attesting to the accuracy of the financial statements contained in the 2021 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

146.  The 2020 10-K provided Humanigen's "scientific rationale" for using LENZ to combat COVID-19, stating the following, in relevant part:

> Lenzilumab neutralizes GM-CSF. The coronavirus pandemic, which has been triggered by the SARS-CoV-2 virus and leads to the condition referred to as COVID-19, is characterized in the later and sometimes fatal stages by lung dysfunction and, in many patients, multi-organ impairment, which is triggered by Cytokine Release Syndrome ("CRS"), or cytokine storm. Publications have pointed to GM-CSF as being a signature cytokine in this process, with elevated GM-CSF levels correlated to poorer outcomes and sometimes ventilator use and Intensive Care Unit ("ICU") admission.
>
> COVID-19 has three distinct phases: early infection, pulmonary/inflammatory and hyperinflammatory. As shown on the diagram below, lenzilumab is being studied for use in patients that are in the pulmonary/inflammatory phase who are hospitalized and hypoxic.
>
> ***
>
> The severe clinical features associated with some COVID-19 infections result from an inflammation-induced lung injury which may require

supplemental oxygen through a nasal cannula, non-invasive or invasive mechanical ventilation or Extra Corporeal Mechanical Oxygenation (ECMO) and sometimes ICU care. This lung injury is a result of a hyperinflammatory dysregulation of the immune system and associated with cytokine storm. The lung injury that leads to death is not directly related to the virus but appears to be a result of a hyper-reactive immune response to the virus triggering a cytokine storm that can continue even after viral titers remain stable or even begin to fall.

***

Data from National Scientific Review (2020, Vol. 7, No. 6) titled "Pathogenic T-cells and inflammatory monocytes incite inflammatory storms in severe COVID-19 patients", supports the hypothesis that GMCSF induced cytokine storm immune mechanisms have contributed to patient mortality with the current pandemic strain and, we believe, in multiple variants, of coronavirus, and there is increasing acceptance that this pathophysiology may be responsible for worsening of clinical status and poor outcomes. The authors noted that steroid treatment in such cases has been disappointing in terms of outcome but suggested that a monoclonal antibody that targets GM-CSF may prevent or curb the hyper-active immune response caused by COVID-19 in this setting. Three recent publications point to GM-CSF as a so-called 'signature cytokine' including the largest inflammatory marker study in over 600 patients from a multicenter study in the UK.

***

While early studies demonstrated elevated GM-CSF levels in both ICU and non-ICU treated COVID-19 patients, one of these three more recent studies showed a positive association with disease severity and outcome, in agreement with reports of elevated frequencies of GM-CSF+ Th1 cells in patients with COVID-19 requiring ICU treatment....

A second independent study reported serum concentrations of GM-CSF were significantly higher in COVID-19 patients. In this study, increased serum concentrations of IL-8, IL-10 and GM-CSF were associated with disease severity....

A third independent study reported a significant correlation between the duration of mechanical ventilation ("MV") and GM-CSF (p < 0.0001),

61

IL-10 (p < 0.0001), IP-10 (p < 0.0001), MCP-1 (p = 0.001), CX3CL1 (p = 0.0233), and Granzyme B (p = 0.0143) ….

Similar to patients receiving CAR-T therapy, the development of CRS in patients with COVID-19 has been associated with elevation of CRP, ferritin, MCP-1, MIP-1 alpha, INF-gamma, TNF-alpha, and IL-6, as well as correlating with respiratory failure, ARDS, and adverse clinical outcomes. . . . We believe that these new data suggest that GM-CSF may be a critical triggering cytokine in the increased mortality in COVID-19.

147.   The 2020 10-K also stated the following about the possible inaccuracy of the "scientific rationale" behind GM-CSF as a cause of CRS in COVID-19 patients:

**The scientific rationale behind the hypothesis that GM-CSF is a cause of the cytokine storm that leads to adverse results in COVID-19 patients is still being tested and may not prove accurate.**

The hypothesis that elevated GM-CSF levels may contribute to cytokine storm-induced immune mechanisms that places patients at greater risk of ICU admission and mortality with the current pandemic strain of coronavirus is unproven. Certain data are the subject of pre-publication papers that have not been peer-reviewed and may not be substantiated. If this hypothesis is not ultimately proven through clinical trials which are underway, the potential for lenzilumab to play a meaningful role in a COVID-19 therapy likely would decrease or be eliminated. We cannot assure you that our exploratory efforts in this respect will be fruitful.

(emphasis in original.)

### April 23, 2021 Proxy Statement

148.   On April 23, 2021, the Company filed its proxy statement on Schedule 14A with the SEC (the "2021 Proxy Statement"). Defendants Durrant, Barliant,

Boehm, Buxton, and Chappell solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

149.   The 2021 Proxy Statement called for Company shareholders to, *inter alia*: (1) reelect Defendants Durrant, Boehm, Barliant, Buxton, and Chappell to serve as directors of the Board; (2) ratify Horne LLP as the Company's registered public accounting firm; (3) approve, on an advisory basis, the compensation of named executive officers; and (4) indicate, on an advisory basis, the preferred frequency of stockholder advisory votes on the compensation of the Company's named executive officers.

150.   The 2021 Proxy Statement stated the following regarding the Board's and the Audit Committee's risk oversight functions:

> Our Board takes an active role in overseeing management of the Company's risks, both through its own consideration of risks associated with our business and strategic initiatives and through its committees' consideration of various risks applicable to that committee's areas of focus. In particular, our Board is responsible for monitoring and assessing strategic risk exposure and our audit committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. The audit committee also monitors compliance with legal and regulatory requirements.

151.   The 2021 Proxy Statement also listed certain responsibilities of the Audit Committee, which at that time consisted of Defendants Boehm (as Chair),

Barliant, and Buxton. These responsibilities included: (1) "appointing, approving the compensation of, and assessing the independence of our registered public accounting firm;" (2) "overseeing the work of our registered public accounting firm, including through the receipt and consideration of reports from such firm;" (3) "reviewing and discussing with management and the registered public accounting firm our annual and quarterly financial statements and related disclosures;" (4) "monitoring our internal control over financial reporting and our disclosure controls and procedures;" and (5) "overseeing our risk assessment and risk management policies."

152.   The 2021 Proxy Statement was materially misleading because it failed to disclose that: (1) contrary to the 2021 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and Audit Committee were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (2) the Individual Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder advisory approval of the executive officers' compensation plan.

153.   The 2021 Proxy Statement also failed to disclose that: (1) certain of the Company's financial statements were false and unreliable; (2) LENZ's efficacy in

treating hospitalized COVID-19 was overstated and the ACTIV-5/BET-B Study would not meet its primary endpoint; (3) additionally, the LIVE-AIR Study did not give Humanigen enough patient safety data to support approval of the LENZ EUA; (4) as a result, it was extremely unlikely the FDA would approve the LENZ EUA; (5) a large amount of both medical and academic data already stated that GM-CSF was integral to proper lung function, contrary to the Company's "hypothesis" from "pre-publication papers" that reducing GM-CSF would help COVID-19 patients; (6) LENZ was not the only purported treatment undergoing clinical studies during the Relevant Period; and (7) the Company failed to maintain adequate internal controls. As a result, the 2021 Proxy Statement was materially false and misleading.

154.   As a result of the material misstatements and omissions contained in the 2021 Proxy Statement, Company shareholders, *inter alia*: (1) reelected Defendants Durrant, Boehm, Barliant, Buxton, and Chappell to the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) ratified Horne LLP as the Company's registered public accounting firm; and (3) approved, on an non-binding advisory basis, the compensation of named executive officers.

### May 13, 2021 Form 10-Q

155.   On May 13, 2021, after the market closed, the Company filed its quarterly report with the SEC for the period ended March 31, 2021 (the "1Q21 10-Q"). The 1Q21 10-Q was signed by Defendant Durrant, and contained SOX

certifications, signed by Defendant Durrant, attesting to the accuracy of the financial statements contained in the 1Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

156.   The 1Q21 10-Q gave investors a progress report on the Company's efforts to obtain the LENZ EUA:

> We have shared the top-line data on just the primary endpoint and one secondary endpoint (the only data then available while the remaining analysis was pending) with the FDA in a Pre-EUA Type B meeting in mid-April 2021. We are preparing to submit an EUA application at the end of May 2021. As requested by the FDA, the EUA application will include secondary endpoints and supplemental data analysis from LIVE-AIR, including those referenced in the MedRxiv publication, as well as additional stability and compatibility information required for the CMC section of the EUA application. **There can be no assurance that the data published on MedRxiv will be sufficient for an EUA or that the FDA will not require additional information in order to grant an EUA.** If the EUA is granted, we could begin to commercialize lenzilumab for the treatment of newly hospitalized COVID-19 pneumonia patients.

(Emphasis added.)

### *May 28, 2021 Press Release*

157.   On May 28, 2021, before the market opened, Humanigen announced in a press release that the Company submitted the LENZ EUA to the FDA for approval, stating "[t]his EUA application follows positive results from the LIVE-AIR Phase 3 clinical trial evaluating the ability of lenzilumab to improve the likelihood of survival without ventilation (SWOV) in newly hospitalized COVID-19 patients."

158.   Additionally, the press release touted LENZ's ability to effectively treat hospitalized COVID-19 patients, in relevant part:

> Lenzilumab achieved the primary endpoint with a 54% relative improvement in the likelihood of SWOV compared to placebo. Lenzilumab also improved the relative likelihood of SWOV by 92% in subjects who received both corticosteroids and remdesivir and resulted in a 3-fold improvement in the likelihood of SWOV in patients with a CRP<150mg/L and less than 85 years of age. In these patients, a 2.2-fold improvement in the likelihood of survival was observed with lenzilumab.

### July 30, 2021 Press Release

159.   On July 30, 2021, Humanigen announced in a press release that the NIH advanced the ACTIV-5/BET-B Study to a Phase 2/3 study. In the press release, Defendant Durrant stated, in relevant part: "We believe ACTIV-5/BET-B, along with LIVE-AIR, will provide the sufficient size and statistical power typically required for a [Biologics License Application ('BLA')] to be submitted to FDA."

### August 12, 2021 Press Release

160.   On August 12, 2021, Humanigen announced in a press release its second quarter 2021 financial results. Among other things, the press release stated that since the Company submitted the LENZ EUA to the FDA, "the company has responded to several requests from the [FDA] regarding the application" and that "the company anticipates that ACTIV-5/BET-B may serve as a second confirmatory study required for submission to FDA as part of a [BLA] that the company would

submit if the ACTIV-5/BET-B data further validate the benefits of lenzilumab in COVID-19 patients."

161.  Defendant Durrant exuded confidence in the August 12, 2021 press release, stating that "[w]e remain firm in our belief the results of our LIVE-AIR Phase 3 study warrant lenzilumab being granted [EUA]" and that "[t]he achievement of the primary endpoint for the overall patient population, and the recent supplemental subset analysis which showed significant response to treatment by Black and African-American patients in the study, support our view of the potential benefit lenzilumab could bring to patient care if authorization were to be granted[.]"

### *August 12, 2021 Form 10-Q*

162.  On the same day, the Company filed its quarterly report with the SEC for the period ended June 30, 2020 (the "2Q21 10-Q"). The 2Q21 10-Q was signed by Defendant Durrant, and contained SOX certifications, signed by Defendant Durrant, attesting to the accuracy of the financial statements contained in the 2Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

163.  The 2Q21 10-Q referenced the capabilities of LENZ in respect to treating patients with COVID-19 and CRS:

> Lenzilumab is a monoclonal antibody that has been demonstrated to neutralize GM-CSF, a cytokine that the Company believes is of critical importance in the hyperinflammatory cascade, sometimes referred to as cytokine release syndrome ('CRS') or cytokine storm, associated with

COVID-19," and that "[t]he Company believes the results from its Phase 3 study in COVID-19, its Phase 1b study in CAR-T, and four other clinical trials support the mechanism of action of lenzilumab.

164.  The 2Q21 10-Q further elaborated on LENZ's performance in the LIVE-AIR Study, in relevant part:

> On May 5, 2021, data from a Phase 3, multi-center, double-blind, placebo-controlled potential registrational trial of lenzilumab as a potential therapeutic for hospitalized, hypoxic patients with COVID-19 pneumonia was published on MedRxiv, a non-peer reviewed journal. We refer to this study as the "LIVE-AIR" study. Data from LIVE-AIR support the previously reported primary endpoint that demonstrated lenzilumab improved the likelihood of survival without ventilation ("SWOV"), sometimes referred to as "ventilator-free survival", by 54% in the modified intent-to-treat ("mITT") population . . . . SWOV also improved on a relative basis by 92% in subjects who received both corticosteroids and remdesivir . . .; by 3.04-fold in subjects with baseline C-reactive protein ("CRP") levels < 150 mg/L at baseline[.]

165.  The 2Q21 10-Q also stated the following about the status of the LENZ EUA and the likelihood the FDA would grant it:

> The Company submitted an application for Emergency Use Authorization ("EUA") of lenzilumab to the U.S. Food and Drug Administration ("FDA") at the end of May 2021. As requested by FDA, the EUA application included secondary endpoints and supplemental data analysis from LIVE-AIR as well as additional stability and compatibility information required for the Chemistry Manufacturing and Control ("CMC") section of the EUA application. Since our initial submission of the application for EUA, we have responded to several requests from FDA regarding the application. **There can be no assurance that the data the Company has submitted to FDA will be sufficient for an EUA**, or that FDA will not require additional information in order to grant an EUA.

> (Emphasis added.)

69

*August 12, 2021 Press Release*

166.  On the same day, the Company announced in a press release Humanigen's second quarter of 2021 financial results. Among other things, the press release said that since filing the LENZ EUA with the FDA, "the company has responded to several requests from the [FDA] regarding the application" and that "the company anticipates that ACTIV-5/BET-B may serve as a second confirmatory study required for submission to FDA as part of a [BLA] that the company would submit if the ACTIV-5/BET-B data further validate the benefits of lenzilumab in COVID-19 patients."

167.  The statements contained in ¶¶ 136-150 and 158-169 were materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) certain of the Company's financial statements were false and unreliable; (2) LENZ's efficacy in treating hospitalized COVID-19 was overstated and the ACTIV-5/BET-B Study would not meet its primary endpoint; (3) additionally, the LIVE-AIR Study did not give Humanigen enough patient safety data to support approval of the LENZ EUA; (4) as a result, it was extremely unlikely the FDA would approve the LENZ EUA; (5) a large amount of both medical and academic data already stated that GM-CSF was integral to proper lung function, contrary to the Company's "hypothesis" from "pre-publication

papers" that reducing GM-CSF would help COVID-19 patients; (6) LENZ was not the only purported treatment undergoing clinical studies during the Relevant Period; and (7) the Company failed to maintain adequate internal controls. As a result, the Company's public statements were materially false and misleading.

### The Truth Begins to Emerge While False and Misleading Statements Continue

*September 9, 2021 Press Release*

168.   On September 9, 2021, before the market opened, the Company announced in a press release (the "September 9, 2021 Press Release") that the FDA denied the LENZ EUA. The press release stated, in relevant part:

> [T]he U.S. FDA has declined its request for emergency use authorization of lenzilumab to treat newly hospitalized COVID-19 patients. In its letter, FDA stated that it was unable to conclude that the known and potential benefits of lenzilumab outweigh the known and potential risks of its use as a treatment for COVID-19.

169.   The September 9, 2021 Press Release further stated that "NIH's ACTIV-5/BET-B study is expected to provide further data that may support a new EUA request" and that the Company "remains committed to completing regulatory processes underway seeking Marketing Authorization for lenzilumab to treat hospitalized COVID-19 patients in the U.K. and other territories[.]"

170.   The September 9, 2021 Press Release contained a statement from Defendant Durrant, reassuring investors that the Company "remain[s] committed to bringing lenzilumab to patients hospitalized with COVID-19" and that "[w]e believe

the ongoing ACTIV-5/BET-B trial, which has been advanced to enroll up to 500 patients, may provide additional safety and efficacy data sufficient to support our efforts to obtain an EUA to treat hospitalized COVID-19 patients."

171.   On this news, the price per share of the Company's common stock fell $7.14 per share from its close price of $15.11 on September 8, 2021 to close at $7.97 per share on September 9, 2021, a decline of approximately 47.25%.

### *September 14, 2021 Form 8-K*

172.   On September 14, 2021, after the market closed, the Company filed a Form 8-K ("September 2021 8-K") with the SEC, which included an attachment of an investor presentation. Defendant Durrant signed the September 2021 8-K. Per the September 2021 8-K, the investor presentation would be used for future investor conferences. The investor presentation included the following slide, which stated that regarding the LENZ EUA, "[n]o safety issues [were] identified by FDA" and that the FDA "noted relatively limited size of [the] safety database":



***October 5, 2021 Guggenheim Vaccine and Infectious Disease Conference***

173.   On October 5, 2021, Defendant Chappell represented Humanigen at the

Guggenheim Vaccine and Infectious Disease Conference. Defendant Chappell said

the following during his opening remarks:

> So just in terms of some updates, as many may be aware, on September 8, the FDA declined our Emergency Use Authorization submission. Essentially, the FDA asked for more clinical data. **Just to be very clear, there was no identification of any safety issues with lenzilumab**. So the FDA invited us to submit more data when it was available and continue the process of developing lenzilumab under an EUA for COVID-19, which we plan to do, and we will get into some of how we plan to supply that additional data.

(Emphasis added.)

***November 9, 2021 Form 8-K***

174.   On November 9, 2021, the Company filed a Form 8-K ("November

2021 8-K") with the SEC. Defendant Durrant signed the November 2021 8-K. The

73

November 2021 8-K included an exhibit titled "Credit Suisse Healthcare Conference Presentation." The presentation included the following slide, which was similar to the slide presented to investors two months earlier in the September 2021 8-K:



*November 12, 2021 Press Release*

175.   On November 12, 2021, the Company announced in a press release its third quarter of 2021 financial results, as well as a general business update. The press release contained a statement from Defendant Durrant regarding LENZ's status, in relevant part: "We are continuing our efforts to get lenzilumab to hospitalized COVID-19 patients. The recent selection of lenzilumab by the European Commission as one of the 10 most promising treatments for COVID-19, validates our view that lenzilumab offers meaningful clinical potential."

*November 12, 2021 10-Q*

176.   On the same day, the Company filed its quarterly report with the SEC for the period ended September 30, 2021 (the "3Q21 10-Q"). The 3Q21 10-Q was signed by Defendant Durrant, and contained SOX certifications, signed by Defendant Durrant, attesting to the accuracy of the financial statements contained in the 3Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

177.   The 3Q21 10-Q contained substantively similar statements that were previously made pertaining to LENZ's alleged efficacy and capabilities in the 2Q21 10-Q, as referenced in ¶¶ 165-168.

178.   Yet, the 3Q21 10-Q elaborated on the FDA's denial of the LENZ EUA, stating that the Company "requested and…been granted a Type B meeting with the FDA." In the meeting request Humanigen sent to the FDA was "day 60 data as well as detailed CRP analysis from the LIVE-AIR study." The 3Q21 10-Q further stated that the Company "intend[s] to submit a [BLA] to FDA for lenzilumab in the treatment of hospitalized COVID-19 patients" and that the Company "plan[s] to include the results of the expanded ACTIV-5/BET-B study as a basis for a BLA-confirmatory study for lenzilumab and believe data from ACTIV-5/BET-B, along

with LIVE-AIR, should provide the sufficient size and statistical power typically required for a BLA to be submitted to FDA."

### December 2, 2021 Form 8-K

179.   On December 2, 2021, the Company filed a Form 8-K ("December 2021 8-K") with the SEC. Defendant Durrant signed the December 2021 8-K. The December 2021 8-K included an investor presentation. The presentation included the following slide, which was similar to the slides presented to investors two months earlier in the September 2021 8-K and one month earlier in the November 2021 8-K:



## The Truth Continues to Emerge While False and
## Misleading Statements Continue

180.   On December 28, 2021, Kiniksa Pharmaceuticals, Ltd., a global biopharmaceutical company founded in Bermuda in 2015, announced results from a Phase 3 trial of its drug candidate, mavrilimumab (the "Kiniksa Trial"). The Kiniksa Trial for mavrilimumab was remarkably like Humanigen's drug trials for LENZ. Like LENZ, mavrilimumab was a fully human monoclonal antibody that attacked granulocyte macrophage colony stimulating factor receptor alpha ("GM-CSFR*a*"). Kiniksa Pharmaceutical's press release stated that "the Phase 3 portion of the Phase 2/3 trial of mavrilimumab in COVID-19-related acute respiratory syndrome (ARDS) did not meet the primary efficacy endpoint."

181.   In contravention of the Defendants' statements, the Kiniksa Trial proved that LENZ was not the "only immunomodulator that was in an active clinical trial in another indication to prevent cytokine storm prior to embarking upon the Phase III COVID-19 trial" and was not the "only agent in an active Phase III trial targeting GM-CSF."

182.   In result, when Kiniksa Pharmaceuticals' GM-CSF drug candidate failed, the Defendants lost more credibility about the efficacy and commercial viability of LENZ in the eyes of investors and the general public.

### January 5, 2022 Press Release

183.   On January 5, 2022, the Company announced in a press release that enrollment in Phase 2/3 of the ACTIV-5/BET-B Study had completed. The press release contained a statement from Defendant Durrant praising the progress made regarding LENZ, in relevant part:

> Completion of target enrollment in ACTIV-5/BET-B is a significant milestone in the development of lenzilumab . . . . We have alignment with the FDA that, if the trial is successful, we can include the results from ACTIV-5/BET-B in an amended [EUA] submission for lenzilumab for hospitalized patients with COVID-19. We look forward to sharing the topline results from ACTIV-5, when available, and submitting an amended EUA.

### March 1, 2022 10-K

184.   On March 1, 2022, the Company filed its annual report for the 2021 Fiscal Year on Form 10-K with the SEC (the "2021 10-K"). The 2021 10-K was signed by Defendants Durrant, Barliant, Boehm, Buxton, Chappell, Hohneker, and Xie and contained SOX certifications, signed by Defendant Durrant, attesting to the accuracy of the financial statements contained in the 2021 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

185.   In respect to LENZ, the 2021 10-K stated that "[l]enzilumab is a monoclonal antibody that has been demonstrated to neutralize . . . a cytokine that we believe is of critical importance in the hyperinflammatory cascade, sometimes

referred to as cytokine release syndrome ('CRS') or cytokine storm, associated with COVID-19[.]"

186.   The 2021 10-K further stated the following about LENZ and the "scientific literature" supporting its use to treat COVID-19:

> Following the emergence of the SARS-CoV-2 virus that leads to the condition referred to as COVID-19, scientific literature suggested that GM-CSF is critical for the initiation of the hyperinflammatory cascade experienced by many hospitalized patients characterized in the later and sometimes fatal stages by lung dysfunction and, in many patients, multiorgan impairment. Multiple publications have pointed to GM-CSF as being a signature cytokine in this process, with elevated GM-CSF levels correlated to poorer outcomes, including ventilator use, Intensive Care Unit ("ICU") admission, and mortality.

> \*\*\*

> Data from National Scientific Review (2020, Vol. 7, No. 6) titled "Pathogenic T-cells and inflammatory monocytes incite inflammatory storms in severe COVID-19 patients", supports the hypothesis that GMCSF induced cytokine storm immune mechanisms have contributed to patient mortality with the current pandemic strain. We believe that there is increasing acceptance that this pathophysiology may be responsible for worsening of clinical status and poor outcomes. The authors noted that steroid treatment in such cases has been disappointing in terms of outcome but suggested that a monoclonal antibody that targets GM-CSF may prevent or curb the hyper-active immune response caused by COVID-19 in this setting. Several publications point to GM-CSF as a so-called 'signature cytokine' including the largest inflammatory marker study in over 600 patients from a multicenter study in the UK….

> \*\*\*

> In response to the scientific literature, we designed and conducted a Phase 3 clinical trial of lenzilumab in newly hospitalized COVID-19 patients, which we refer to as the "LIVE-AIR" study, to examine whether lenzilumab's neutralization of human GM-CSF could prevent or reduce poor outcomes associated with COVID-19.

\*\*\*

. . . Topline results from ACTIV-5/BET-B are expected to be released late in the first quarter or early in the second quarter of 2022. If confirmatory of the results of the findings of the CRP subgroup from the LIVE-AIR study, we plan to include the results from ACTIV-5/BET-B in an amendment to our EUA submission….

187.   The 2021 10-K also stated that the Company "believe[s] that we have built a strong intellectual property position in the area of GM-CSF neutralization through multiple approaches and mechanisms, as they pertain to COVID-19[.]"

### April 12, 2022 Proxy Statement

188.   On April 12, 2022, the Company filed the 2022 Proxy Statement. Defendants Durrant, Barliant, Boehm, Buxton, Chappell, Hohneker, and Xie solicited the 2022 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

189.   The 2022 Proxy Statement called for Company shareholders to, *inter alia*: (1) ratify Horne LLP as the Company's registered public accounting firm; (2) approve, on an advisory basis, the compensation of named executive officers; and (3) reelect Defendants Durrant, Boehm, Barliant, Buxton, Chappell, Hohneker, and Xie to serve as directors of the Board.

190.   The 2022 Proxy Statement stated the following regarding the Board's and the Audit Committee's risk oversight functions:

Our Board takes an active role in overseeing management of the

Company's risks, both through its own consideration of risks associated with our business and strategic initiatives and through its committees' consideration of various risks applicable to that committee's areas of focus. In particular, our Board is responsible for monitoring and assessing strategic risk exposure and our audit committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. The audit committee also monitors compliance with legal and regulatory requirements.

191.   The 2022 Proxy Statement also listed certain responsibilities of the Audit Committee, which at that time consisted of Defendants Xie (as Chair), Boehm, and Buxton. These responsibilities included: (1) "appointing, approving the compensation of, and assessing the independence of our registered public accounting firm;" (2) "overseeing the work of our registered public accounting firm, including through the receipt and consideration of reports from such firm;" (3) "reviewing and discussing with management and the registered public accounting firm our annual and quarterly financial statements and related disclosures;" (4) "monitoring our internal control over financial reporting and our disclosure controls and procedures;" and (5) "overseeing our risk assessment and risk management policies."

192.   The 2022 Proxy Statement was materially misleading because it failed to disclose that: (1) contrary to the 2022 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and Audit Committee were not adequately exercising these functions, were

causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (2) the Individual Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder advisory approval of the executive officers' compensation plan.

193.    The 2022 Proxy Statement also failed to disclose that: (1) certain of the Company's financial statements were false and unreliable; (2) LENZ's efficacy in treating hospitalized COVID-19 was overstated and the ACTIV-5/BET-B Study would not meet its primary endpoint; (3) additionally, the LIVE-AIR Study did not give Humanigen enough patient safety data to support approval of the LENZ EUA; (4) as a result, it was extremely unlikely the FDA would approve the LENZ EUA; (5) a large amount of both medical and academic data already stated that GM-CSF was integral to proper lung function, contrary to the Company's "hypothesis" from "pre-publication papers" that reducing GM-CSF would help COVID-19 patients; (6) LENZ was not the only purported treatment undergoing clinical studies during the Relevant Period; and (7) the Company failed to maintain adequate internal controls. As a result, the 2022 Proxy Statement was materially false and misleading.

194.    As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company shareholders, *inter alia*: (1) ratified Horne LLP

as the Company's registered public accounting firm; (2) approved, on an non-binding advisory basis, the compensation of named executive officers; and (3) reelected Defendants Durrant, Boehm, Barliant, Buxton, Chappell, Hohneker, and Xie to the Board, who breached their fiduciary duties to the Company.

### *May 5, 2022 Press Release*

195.   On May 5, 2022, the Company announced in a press release its first quarter of 2022 financial results. The press release contained a statement from Defendant Durrant regarding LENZ's status, in relevant part:

> A key highlight of the first quarter was the completion of enrollment in the ACTIV-5/BET-B study. We also held a productive Type B preEUA meeting with FDA where we gained alignment on the data and statistical analysis plan to be included as part of the amendment to our EUA for [lenzilumab] in COVID-19 patients. In concert with the NIH, we anticipate top-line data in the primary analysis population to be reported in the second quarter, with an amendment to our EUA submission planned to follow[.]

### *May 5, 2022 Form 10-Q*

196.   On the same day, the Company filed its quarterly report with the SEC for the period ended March 31, 2022 (the "1Q22 10-Q"). The 1Q22 10-Q was signed by Defendant Durrant, and contained SOX certifications, signed by Defendant Durrant, attesting to the accuracy of the financial statements contained in the 1Q22 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

197.   1Q22 10-Q continued to purport that "[l]enzilumab is a monoclonal antibody that has been demonstrated to neutralize . . . a cytokine that we believe is of critical importance in the hyperinflammatory cascade, sometimes referred to as cytokine release syndrome ('CRS') or cytokine storm, associated with COVID-19[.]"

198.   The 1Q22 10-Q also addressed LENZ's future, stating, among other things, that "[t]he next anticipated step in the Company's development program for lenzilumab in COVID-19 is the release of results from the . . . ACTIV-5/BET-B trial," and that if "confirmatory of the findings of the CRP subgroup from the Company's LIVE-AIR study, the Company plans to include the results from ACTIV-5/BET-B in an amendment to its [EUA] submission to the [FDA.]"

***June 21, 2022 Lytham Partners' Summer Investor Conference***

199.   On June 21, 2022, Defendant Chappell represented Humanigen in San Francisco, California at Lytham Partners' Summer Investor Conference. During the conference, Defendant Chappell addressed several questions from analysts, stating the following, in relevant part:

*Joe Diaz Lytham Partners – Managing Partner*

So how does your drug candidate, lenzilumab, work? And what implications does this have for its potential use in COVID-19 and potentially other indications?

*Dale Chappell Humanigen, Inc. – Chief Scientific Officer*

Yeah, Joe, let me just -- I think I skipped over the last part of your prior question on INV and death, so maybe I'll go back and address that, and then I'll jump to the mechanism of action of lenz. . . . .

*Joe Diaz Lytham Partners – Managing Partner*
Sure. So again, with regards to lenz, let's talk about its implications for COVID-19 and other possible indications.

*Dale Chappell Humanigen, Inc. – Chief Scientific Officer*

Yes, absolutely. So as we've talked about at the very beginning when we are introducing the company, lenzilumab neutralizes this inflammatory cytokine called GM-CSF. And when we think about GM-CSF, what does it actually do? It activates a specific part of the immune system called myeloid cells. Now, myeloid cells are very important for cytokine storm because they are the cytokine factories. If you want to think about them that way. And GM-CSF is really what drives myeloid cells. So it causes them to be hyper-stimulated and to secrete a lot of cytokines. So we talked about GM-CSF being an upstream driver, a cytokine storm. And you can see it here on the slide with the arrow pointing to this myeloid cell or the cytokine factory. It causes this cytokine factory to get ramped up. And then that cytokine factory produces a number of other inflammatory cytokines such as IL-1 and IL-6.

And that's what really then leads to what we think about as cytokine storm. And once we get this overproduction of these inflammatory cytokines, we can get in-organ damage. You can get a pulmonary damage, for example, or renal damage. And that's what we see in COVID-19.

\*\*\*

*Joe Diaz Lytham Partners – Managing Partner*

Yes. So as it relates to your expectation of data from the NIH ACTIV-5, which you're expecting really in next month or so. Assuming that data is positive, what would you imagine next step be to seek regulatory ability, to commercialize lenz for COVID-19? What's the next step?

*Dale Chappell Humanigen, Inc. – Chief Scientific Officer*

85

So our expectations are that within weeks of receiving that topline data from NIH, and I remember this is an NIH study, so that data will be coming from NIH. We plan to amend our emergency use authorization with FDA, followed shortly thereafter by a formal response to MHRA. Now, that's the UK regulatory authority. So we'll be filing that same data then with MHRA in the UK for a conditional marketing authorization.

In terms of our plans for the European Union and their regulatory authority, the EMA, again, we'll use that data package from ACTIV-5 and the ACTIV-5. So both data packages. And we'll be seeking a conditional marketing authorization there for the EMA, for the European Union. And we'll do that under a accelerated assessment process.

So with positive data, we think we can have regulatory authorizations and be potentially commercializing, assuming authorization, lenzilumab for hospitalized patients with COVID-19 this year. So this could be a very important year and a real value-inflection point for Humanigen from a late-stage biotech company to a true commercialization footprint.

200. The statements contained in ¶¶ 175-182, 186-190, and 198-202 were materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) certain of the Company's financial statements were false and unreliable; (2) LENZ's efficacy in treating hospitalized COVID-19 was overstated and the ACTIV-5/BET-B Study would not meet its primary endpoint; (3) additionally, the LIVE-AIR Study did not give Humanigen enough patient safety data to support approval of the LENZ EUA; (4) as a result, it was extremely unlikely the FDA would approve the LENZ EUA;

(5) a large amount of both medical and academic data already stated that GM-CSF was integral to proper lung function, contrary to the Company's "hypothesis" from "pre-publication papers" that reducing GM-CSF would help COVID-19 patients; (6) LENZ was not the only purported treatment undergoing clinical studies during the Relevant Period; and (7) the Company failed to maintain adequate internal controls. As a result, the Company's public statements were materially false and misleading.

### The Truth Fully Emerges

201.   The truth fully emerged after markets closed on July 12, 2022, when the Company issued a press release announcing that LENZ failed to achieve statistical significance on the primary endpoint of the ACTIV-5/BET-B Study. The press release stated, in relevant part:

> Humanigen . . . has been informed of preliminary topline results from the National Institute of Allergy and Infectious Diseases' (NIAID) ACTIV-5/BET-B trial evaluating lenzilumab plus remdesivir versus placebo plus remdesivir in hospitalized COVID-19 patients. The trial did not achieve statistical significance on the primary endpoint . . . . The data also showed a non-significant trend toward a reduction in mortality in the overall patient population[.]

202.   On this news, the price per share of the Company's common stock fell $2.38 per share from its close price of $2.99 per share on July 12, 2022 to close at $0.61 per share on July 13, 2022, a decline of approximately 79.6%.

**The Individual Defendants' Knowledge of the Insufficiency of the LENZ EUA**

203.  The Individual Defendants knew, or were reckless in not knowing, that the Company's patient safety data was insufficient to support FDA approval under both the EUA and the BLA approval process. Despite this knowledge, the Individual Defendants strung investors and the public along through the FDA approval process with insincere confidence that LENZ would be an approved and marketed drug for COVID-19 treatment.

204.  Indeed, despite not enrolling enough patients, per the requirements of the FDA Publication in June 2021 for its LIVE-AIR Study, Humanigen went forward with the study anyway. On November 6, 2020, Humanigen published "positive interim Phase 3 data" that, according to Defendant Chappell, "significantly de-risked" the LIVE-AIR Study and supported the "addition of patients" from about 300 participants to 515 participants. At this time, Defendant Chappell further stated that the interim data supported the Company's goal of obtaining EUA and/or BLA FDA approval. He further stated that the Company would give another interim update when the LIVE-AIR Study added "approximately 390 patients."

205.  On December 31, 2020, Humanigen gave a "update" regarding the LIVE-AIR Study after the market had closed. As stated above, the update stated that another "interim analysis for safety" was conducted by the LIVE-AIR Study's independent data safety monitoring board, and, based upon "feedback from FDA

regulators regarding the amount of patient data that would be required to support [a BLA]," the Company had "decided not to conduct an interim analysis for efficacy."

206.   The Individual Defendants knew, or were reckless in not knowing, that the Company's LENZ EUA was not fit for approval based upon the LIVE-AIR Study data.

207.   Additionally, the Company employed Medical Science Liaisons to show doctors in the field about LENZ's possible capabilities to treat COVID-19 patients. According to two previous Humanigen Medical Science Liaisons, Medical Science Liaisons would regularly meet with Company executives to inform them about the Medical Science Liaisons' interactions with doctors in the field.

208.   The first Medical Science Liaison ("MSL 1") worked for the Company through a third-party company called Eversana from June 2021 to January 2022. MSL 1 reported to Eversana employee Marc Bernarducci. Bernarducci then reported to Humanigen's SVP, Clinical, Medical, and Scientific Affairs, Omar Ahmed.

209.   The second Medical Science Liaison ("MSL 2") worked for the Company from August 2021 to January 2022. MSL 2 reported to Bernarducci as well.

210.   MSL 1 maintains that they, along with other members of the Medical Science Liaison team consistently met (monthly, and sometimes, more frequently) with Humanigen executives, including Omar Ahmed, Adrian Kilcoyne (Chief

Medical Officer), and Ed Jordan (Chief Commercial Officer). The Medical Science Liaison team informed Company executives by deploying PowerPoint presentations, which were also made available to other Company executives. MSL 2 maintains that Omar Ahmed, Adrian Kilcoyne, and Ed Jordan attended these meetings.

211.  MSL 1 stated that during the meetings, the Medical Science Liaison team told Company executives that doctors in the field were asking for more safety and efficacy data than the LIVE-AIR Study provided before they would accept LENZ as a COVID-19 treatment. MSL 2 remembered hearing the sentiment from multiple doctors in the field that they did not think the LIVE-AIR Study was large enough to make an informed decision. Therefore, when the FDA denied Humanigen's LENZ EUA, MSL 1 was not surprised.

212.  Despite this reality inside the Company, the Individual Defendants manufactured a public façade that Humanigen followed the FDA's guidance, as seen in an email sent by Defendant Durrant to Dr. Scott Greenbaum. The email attached a link to the FDA's May 2021 guidance entitled, *COVID-19: Master Protocols Evaluating Drugs and Biological Products for Treatment or Prevention*. The May 2021 guidance explicitly stated that it was "intended to complement other COVID-19 guidance" and also included a reference to the FDA Publication issued in June 2020. The May 2021 guidance also stated that the "[c]ollection of safety data is important for novel drugs as well as repurposed drugs being evaluated for COVID-

19, **as the safety profile of repurposed drugs may differ in a new population**"

(emphasis added).

213.   The Individual Defendants issued public statements to keep the Company's stock price artificially inflated throughout the Relevant Period. Another example of the Individual Defendants attempting to prop up Humanigen's prospects occurred on June 21, 2021, when Defendant Durrant sent Dr. Scott Greenbaum a email which contained an analyst report from Jeffries. In the email, Defendant Durrant tried to highlight the benefits of LENZ:



214. About two months later, Defendant Durrant emailed Dr. Scott Greenbaum again to emphasize the struggle across the world to develop a COVID-19 vaccine, and consequently, the importance of treatments such as LENZ. On August 17, 2021, Defendant Durrant email Dr. Scott Greenbaum a news article about Israel's vaccination program and further opined about the helpfulness of mRNA vaccines:

**From:** SCOTT GREENBAUM ████████████████
**Date:** August 17, 2021 at 9:18:49 AM EDT
**To:** Cameron Durrant ████████████████
**Subject:** Re: A grim warning from Israel: Vaccination blunts, but does not defeat Delta

Thank you - great to hear from you again - still hopeful for a favorable outcome.

Sent from my iPhone

> On Aug 17, 2021, at 7:26 AM, Cameron Durrant ████████████████ wrote:
>
> We have known this for a long time now by watching the Israeli data but the world is finally catching on.  mRNA Vaccines offer imperfect protection with a very limited duration of efficacy.  This is in the face of a highly transmissible virus but not a true immune escape virus.  That experiment is yet to play itself out on a vaccinated population.
>
> https://www.sciencemag.org/news/2021/08/grim-warning-israel-vaccination-blunts-does-not-defeat-delta

215.   Despite knowing the serious patient safety risks LENZ presented in COVID-19 patients, the Individual Defendants did not seek to complete a large clinical trial. Moreover, Individual Defendants were aware of or recklessly disregarded the FDA's guidance on the necessary requirements of EUA and BLA approvals. Instead, the Individual Defendants doubled down on the LIVE-AIR Study and submitted a haphazard LENZ EUA in an effort to financially buoy Humanigen and surpass competitors. Indeed, as early as May 15, 2020, the Company confessed in its SEC filings that: "If our competitors develop and receive FDA approval for treatments or vaccines for COVID-19, **our commercial opportunity will be**

93

**reduced or eliminated**. . .. If we are not the first therapy approved, or if other competing therapies are approved after lenzilumab, and/or a preventative vaccine is approved, such approval could have a **material adverse impact on our ability to commercialize lenzilumab as a therapy for COVID-19**" (emphasis added).

### Insider Sales

216.   Defendants Durrant and Chappell made insider sales, detailed above, at prices artificially inflated by the false and misleading statements at issue for collective proceeds exceeding $70 million.

217.   Those sales that occurred shortly before or after the Individual Defendants caused the Company to issue false and misleading statements contribute to an inference that these Individual Defendants knew of the falsity of the statements and were cashing in while the Company's common stock continued to trade at artificially inflated prices.

218.   For instance, Defendant Durrant sold 81,441 common shares on June 14, 2021, just days after the Company announced in a press release that it had submitted the LENZ EUA to the FDA for approval. The press release, and the Company's public statements both before and after the press release, contained false and misleading statements, which kept Humanigen's stock trading at artificially inflated prices. From that insider sale, Defendant Durrant received $1,692,344 in total proceeds.

219.   Humanigen submitted the LENZ EUA to the FDA on May 28, 2021. Defendant Chappell, as CSO, a Company director, and as the Company's largest stockholder at that point in time, sold an extraordinary amount of stock between June 2021 and August 2021 when the LENZ EUA was pending.

220.   This short burst of selling is indicative of Defendant Chappell's knowledge that the LENZ EUA was weak and would not be granted by the FDA. Further, the burst of selling in the summer of 2021 is an anomaly for Defendant Chappell's trading patterns.

221.   In fact, Defendant Chappell had not sold any common shares of Company stock before or after the Relevant Period. In total, Defendant Chappell made twenty-three separate insider sales between June 2, 2021 and August 12, 2021. Collectively during this time, he sold 3,835,000 common shares for aggregate proceeds of $68,759,862. Had Defendant Chappell sold the same number of common shares after the Relevant Period, he would have received just over $2 million. Therefore, by selling an extraordinary amount of his common stock on inside information in the summer of 2021, he avoided losses of more than $66 million.

222.   The timing and amounts of these insider sales, made while the price of the Company's common stock was artificially inflated, further demonstrate that the Individual Defendants, including those who served on the Board, knew of the falsity

of the statements made and that those Individual Defendants who made insider sales were using this knowledge to enrich themselves while the Company's common stock remained inflated.

## DAMAGES TO HUMANIGEN

223.   As a direct and proximate result of the Individual Defendants' misconduct, Humanigen has lost and will continue to lose and expend many millions of dollars.

224.   Such expenditures include, but are not limited to, the fees associated with the Securities Class Action filed against the Company and the Company's CEO, Chairman of the Board, CSO, and member of the Board, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

225.   Such expenditures also include, but are not limited to, the costs incurred by the Company in restating its previous financial statements.

226.   Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

227.   As a direct and proximate result of the Individual Defendants' conduct, Humanigen has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future

due to the Company's and its misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

228.   Plaintiff brings this action derivatively and for the benefit of Humanigen to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Humanigen, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

229.   Humanigen is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

230.   Plaintiff is, and has been at all relevant times, a shareholder of Humanigen. Plaintiff will adequately and fairly represent the interests of Humanigen in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

231.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

232.   A pre-suit demand on the Board of Humanigen is futile and, therefore,

excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Durrant, Boehm, Barliant, Buxton, Chappell, Xie, and Hohneker (the "Directors"). Plaintiff needs only to allege demand futility as to four of seven Directors who are on the Board at the time this action is commenced.

233.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

234.   In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the foregoing schemes. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. Moreover, the Directors caused the Company to fail to maintain internal controls over financial reporting and to fail to maintain effective disclosure controls and procedures. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

235.   Additional reasons that demand on Defendant Durrant is futile follow. Defendant Durrant has served as the Chairman of the Board since January 2016 and

as the CEO since March 2016. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Durrant with his principal occupation for which he receives handsome compensation. As a trusted Company officer and director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Durrant signed, and thus personally made, the false and misleading statements contained in the 2021 and 2022 10-Ks. Moreover, the 2021 and 2022 Proxy Statements were solicited on his behalf and the false and misleading statements contained therein contributed to his reelection to the Board. His insider sale before the fraud was exposed, which coincided with him and the Company making false and misleading statements, yielded approximately $1.7 million in proceeds and demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Durrant is a defendant in the Securities Class Action. For these reasons, Defendant Durrant breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

236.   Additional reasons that demand on Defendant Boehm is futile follow. Defendant Boehm has served as a Company director since February 2018. Defendant

Boehm signed, and thus personally made, the false and misleading statements contained in the 2020 and 2021 10-Ks. Moreover, the 2021 and 2022 Proxy Statements were solicited on his behalf and the false and misleading statements contained therein contributed to his reelection to the Board. As a director throughout the Relevant Period, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he served as a member of Humanigen's Audit Committee and, in that capacity, he failed to oversee, *inter alia*, the integrity of the Company's financial statements, the Company's internal control over financial reporting, and the effectiveness of its disclosure controls and procedures, as he was required to do under the Audit Committee Charter. For these reasons, Defendant Boehm breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

237.   Additional reasons that demand on Defendant Barliant is futile follow. Defendant Barliant has served as a Company director since January 2016. He currently serves as a member of the Nominating and Corporate Governance Committee. Defendant Barliant signed, and thus personally made, the false and misleading statements contained in the 2020 and 2021 10-Ks. The 2021 and 2022

Proxy Statements were solicited on his behalf and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Barliant breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

238.   Additional reasons that demand on Defendant Buxton is futile follow. Defendant Buxton has served as a Company director since December 2019. She also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. Defendant Buxton signed, and thus personally made, the false and misleading statements contained in the 2020 and 2021 10-Ks. The 2021 and 2022 Proxy Statements were solicited on her behalf and the false and misleading statements contained therein contributed to her reelection to the Board. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, she served

as a member of Humanigen's Audit Committee and, in that capacity, she failed to oversee, *inter alia*, the integrity of the Company's financial statements, the Company's internal control over financial reporting, and the effectiveness of its disclosure controls and procedures, as she was required to do under the Audit Committee Charter. For these reasons, Defendant Buxton breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

239.   Additional reasons that demand on Defendant Chappell is futile follow. Defendant Chappell has served as a Company director since February 2021 and as the CSO since July 2020. Therefore, as the Company admits, he is a non-independent director. Defendant Chappell signed, and thus personally made, the false and misleading statements contained in the 2021 10-K. The 2021 and 2022 Proxy Statements were solicited on his behalf and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His vast insider sales before the fraud was exposed, which coincided with him and the Company making false and misleading statements, yielded approximately $68.7 million in proceeds

and demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Chappell is a defendant in the Securities Class Action. For these reasons, Defendant Chappell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

240.   Additional reasons that demand on Defendant Xie is futile follow. Defendant Xie has served as a Company director since October 2021. Defendant Xie signed, and thus personally made, the false and misleading statements contained in the 2021 10-K. The 2022 Proxy Statement was solicited on his behalf and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Xie breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

241.   Additional reasons that demand on Defendant Hohneker is futile follow. Defendant Hohneker has served as a Company director since October 2021. Defendant Hohneker signed, and thus personally made, the false and misleading

statements contained in the 2021 10-K. The 2022 Proxy Statement was solicited on his behalf and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Hohneker breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

242.   Additional reasons that demand on the Board is futile follow.

243.   The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

244.   The Audit Committee Defendants, consisting of Defendants Xie, Boehm, Barliant, and Buxton, served as members of Humanigen's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for, *inter alia*, overseeing

accounting and financial reporting processes, and reviewing and discussing with management major issues regarding accounting principles and financial statement presentations, as well as major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies. The Audit Committee Defendants failed to adequately oversee the Company's reporting processes, failed to remediate major issues regarding accounting principles, financial statement presentations, and identify or remedy deficiencies with the Company's internal controls, and failed prevent the Company from issuing false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

245. Demand in this case is further excused because the Directors are beholden to Defendant Chappell, who is a Company director, officer, and significant stakeholder in the Company. Defendant Chappell beneficially owns approximately 12.6 million shares of Company common stock as of April 5, 2022, or 18.0%. Thus, his substantial holdings and his continued presence on the Board and as the Company's CSO make him a significant shareholder who exercises outsized voting power on almost all facets of the Company. In light of Defendant Chappell's significant control of the Company, the Directors cannot impartially consider a demand against Defendant Chappell, an interested, primary wrongdoer, as their

continued employment with the Company is partly contingent on Defendant Chappell's decisions. Thus, the Directors are unable to evaluate a demand with disinterest or independence as a result of Defendant Chappell's significant voting influence.

246.   The Directors violated the Code, Company policy, and the Company's corporate governance documents by engaging in or permitting the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, violations of the Exchange Act, and failing to report the same. Further in violation of the Code and the Company's policies, the Individual Defendants failed to maintain internal controls, failed to maintain the accuracy of Company records and reports, and failed to comply with applicable laws and regulations.

247.   In violation of Humanigen's Audit Committee Charter, the Audit Committee Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

Moreover, in violation of Humanigen's Audit Committee Charter, the Audit Committee Defendants failed to adequately oversee major issues regarding the Company's accounting principles and financial statement presentations and major issues related to the adequacy of the Company's internal controls, including the Company's internal control over financial reporting and disclosure controls and procedures.

248. The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for the Company the damages the Company suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

249. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on

behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

250.   The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

251.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of the Company. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Directors or certain of the officers of the Company, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

252.   If there is no directors' and officers' liability insurance, then the

Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

253.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

254.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

255.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

256.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act,

provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

257.   Under the direction and watch of Defendants Durrant, Boehm, Barliant, Buxton, and Chappell, the 2021 Proxy Statement failed to disclose, *inter alia*: (1) contrary to the 2021 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and Audit Committee were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (2) the Individual Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder advisory approval of the executive officers' compensation plan.

258.   The 2021 Proxy Statement also failed to disclose that: (1) certain of the Company's financial statements were false and unreliable; (2) LENZ's efficacy in treating hospitalized COVID-19 was overstated and the ACTIV-5/BET-B Study would not meet its primary endpoint; (3) additionally, the LIVE-AIR Study did not

110

give Humanigen enough patient safety data to support approval of the LENZ EUA; (4) as a result, it was extremely unlikely the FDA would approve the LENZ EUA; (5) a large amount of both medical and academic data already stated that GM-CSF was integral to proper lung function, contrary to the Company's "hypothesis" from "pre-publication papers" that reducing GM-CSF would help COVID-19 patients; (6) LENZ was not the only purported treatment undergoing clinical studies during the Relevant Period; and (7) the Company failed to maintain adequate internal controls. As a result, the 2021 Proxy Statement was materially false and misleading.

259.   In the exercise of reasonable care, the Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement was materially false and misleading. The false and misleading elements of the 2021 Proxy Statement led Company shareholders to, among other things: (1) reelect Defendants Durrant, Boehm, Barliant, Buxton, and Chappell to the Board; (2) ratify Horne LLP as the Company's registered public accounting firm; and (3) approve, on a non-binding advisory basis, the compensation of named executive officers.

260.   The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the 2021 Proxy Statement.

261.   Under the direction and watch of Defendants Durrant, Boehm, Barliant, Buxton, Chappell, Xie, and Hohneker the 2022 Proxy Statement failed to disclose,

*inter alia*: (1) contrary to the 2022 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and Audit Committee were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (2) the Individual Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder advisory approval of the executive officers' compensation plan.

262.   The 2022 Proxy Statement also failed to disclose that: (1) certain of the Company's financial statements were false and unreliable; (2) LENZ's efficacy in treating hospitalized COVID-19 was overstated and the ACTIV-5/BET-B Study would not meet its primary endpoint; (3) additionally, the LIVE-AIR Study did not give Humanigen enough patient safety data to support approval of the LENZ EUA; (4) as a result, it was extremely unlikely the FDA would approve the LENZ EUA; (5) a large amount of both medical and academic data already stated that GM-CSF was integral to proper lung function, contrary to the Company's "hypothesis" from "pre-publication papers" that reducing GM-CSF would help COVID-19 patients; (6) LENZ was not the only purported treatment undergoing clinical studies during the

Relevant Period; and (7) the Company failed to maintain adequate internal controls. As a result, the 2022 Proxy Statement was materially false and misleading.

263.   In the exercise of reasonable care, the Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement was materially false and misleading. The false and misleading elements of the 2022 Proxy Statement led Company shareholders to, among other things: (1) ratify Horne LLP as the Company's registered public accounting firm; (2) approve, on a non-binding advisory basis, the compensation of named executive officers; and (3) reelect Defendants Durrant, Boehm, Barliant, Buxton, Chappell, Xie, and Hohneker to serve as directors of the Board.

264.   The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the 2022 Proxy Statement.

265.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

266.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

267.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of the

Company's business and affairs.

268.   Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

269.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the Company's rights and interests.

270.   In breach of their fiduciary duties owed to the Company, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) certain of the Company's financial statements were false and unreliable; (2) LENZ's efficacy in treating hospitalized COVID-19 was overstated and the ACTIV-5/BET-B Study would not meet its primary endpoint; (3) additionally, the LIVE-AIR Study did not give Humanigen enough patient safety data to support approval of the LENZ EUA; (4) as a result, it was extremely unlikely the FDA would approve the LENZ EUA; (5) a large amount of both medical and academic data already stated that GM-CSF was integral to proper lung function, contrary to the Company's "hypothesis" from "pre-publication papers" that reducing GM-CSF would help COVID-19 patients; (6) LENZ was not the only purported treatment undergoing clinical studies during the Relevant Period; and (7) the

Company failed to maintain adequate internal controls. As a result, the Company's public statements were materially false and misleading.

271.   The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

272.   Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls and effective disclosure controls and procedures.

273.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and

to prevent it from continuing to occur.

274. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

275. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, the Company has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

276. Plaintiff on behalf of the Company has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Unjust Enrichment

277. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

278. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

279. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance or artificially inflated valuation of the Company, or received compensation or other payments that were unjust in light of

the Individual Defendants' bad faith conduct.

280.   Plaintiff, as a shareholder and a representative of the Company, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

281.   Plaintiff on behalf of the Company has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Abuse of Control

282.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

283.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

284.   As a direct and proximate result of the Individual Defendants' abuse of control, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

285.   Plaintiff on behalf of the Company has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

286.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

287.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly-held corporation.

288.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained and will continue to sustain significant damages.

289.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

290.   Plaintiff on behalf of the Company has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

291.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

292.   The Individual Defendants caused the Company to pay the Individual

118

Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

293.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused the Company to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

294.   As a result of the waste of corporate assets, the Individual Defendants and are each liable to the Company.

295.   Plaintiff on behalf of the Company has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Durrant and Chappell for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

296.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

297.   The Company and Defendants Durrant and Chappell are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the

Company's liability will be in whole or in part due to Defendants Durrant and Chappell's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

298.   Defendants Durrant and Chappell, because of their positions of control and authority as the Company's CEO, Chairman of the Board, CSO, and member of the Board, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

299.   Accordingly, Defendants Durrant and Chappell are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

300.   As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Durrant and Chappell.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Humanigen, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or

aided and abetted the breach of their fiduciary duties to the Company;

(c)     Determining and awarding to the Company the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing the Company and the Individual Defendants to take all necessary actions to reform and improve the Company corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of the Company to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding the Company restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: May 17, 2023                           Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: */s/Laurence M. Rosen*
Laurence M. Rosen
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 313-1887
Facsimile: (973) 833-0399
Email: lrosen@rosenlegal.com

Phillip Kim
Erica L. Stone
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
Email: estone@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501

New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

123

## **VERIFICATION**

I,    In Chul Yang    am    a    plaintiff    in    the within    action.
I have reviewed the allegations made in this shareholder derivative complaint,
know the contents thereof, and authorize its filing. To those allegations of which
I have personal knowledge, I believe those allegations to be true. As to those
allegations of which I do not have personal knowledge, I rely upon my counsel and
their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th
day of _____5/12/2023_____, 2023.

DocuSigned by:

_____
In Chul Yang